09:49:25   1                    UNITED STATES DISTRICT COURT

           2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

           3

           4    UNITED STATES OF AMERICA,          .
                                                   .
           5         PLAINTIFF,                     . NO. 20-MJ-4538
                                                   .
           6              V.                        . NOVEMBER 5, 2020
                                                   .
           7    GUSTAVO LAZCANO-NERIA,             . SAN DIEGO, CALIFORNIA
                                                   .
           8         DEFENDANT.                     .
                . . . . . . . . . . . . . . . . . ..

           9

09:49:25  10

          11              TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
                        BEFORE THE HONORABLE ALLISON H. GODDARD
          12                UNITED STATES MAGISTRATE JUDGE

          13    APPEARANCES:

          14    FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
                                        BY: PAUL BENJAMIN
          15                            880 FRONT STREET, ROOM 6293
                                        SAN DIEGO, CALIFORNIA  92101
          16
                FOR THE DEFENDANT:      FEDERAL DEFENDERS OF SAN DIEGO, INC
          17                            BY: RYAN STITT
                                        225 BROADWAY, SUITE 900
          18                            SAN DIEGO, CALIFORNIA  92101

          19    THE INTERPRETER:        PAULA NAVARRO-GOMEZ
                                        AND MARIA PAZ SANDOVAL
          20
                COURT REPORTER:         JULIET Y. EICHENLAUB, RPR, CSR
          21                            USDC CLERK'S OFFICE
                                        333 WEST BROADWAY, ROOM 420
          22                            SAN DIEGO, CALIFORNIA  92101
                                        JULIET_EICHENLAUB@CASD.USCOURTS.GOV
          23

          24

          25    REPORTED BY STENOTYPE VIA TELECONFERENCE, TRANSCRIBED BY
                COMPUTER

1                              **<u>INDEX</u>**

2   EXAMINATION

3   WITNESS NAME                    DIRECT  CROSS  REDIRECT  RECROSS

4      AGENT RYAN COURTNEY............ 7      36     44        45

5      AGENT CHRISTIAN RIVAS ......... 50

6      AGENT CHRISTOPHER MODROW....... 64     68

7   EXHIBITS

8   EXHIBIT    DESCRIPTION                              EVIDENCE

9   1A THROUGH    ................................................ 12
    1C
10  2             ................................................ 33

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

09:49:25   1        SAN DIEGO, CALIFORNIA; NOVEMBER 5, 2020; 10:07 A.M.

2                            -OOO-

3             THE CLERK:  CALLING MATTER NUMBER FOUR, 20-MJ-4538,

4    USA VS. GUSTAVO LAZCANO-NERIA.

5             THE COURT:  OKAY.  YOU CAN ENTER APPEARANCES.

6             MR. BENJAMIN:  GOOD MORNING, YOUR HONOR.  PAUL

7    BENJAMIN FOR THE UNITED STATES.

8             THE COURT:  GOOD MORNING.

9             MR. STITT:  RYAN STITT, FEDERAL DEFENDERS, ON BEHALF

10   OF MR. LAZCANO WHO IS PRESENT IN CUSTODY AND BEING ASSISTED BY

11   THE SPANISH LANGUAGE INTERPRETER.

12            THE COURT:  OKAY.  SO WE'RE OBVIOUSLY IN A LITTLE BIT

13   DIFFERENT TIMES.  SO A COUPLE THINGS:  IF COUNSEL WANTS TO STAY

14   SEATED THROUGHOUT THE TRIAL, THAT'S NOT A PROBLEM.  THAT WILL

10:08:20  15   HELP YOU STAY CLOSER TO THE MICROPHONE SO THAT THE COURT

16   REPORTER, WHO IS HERE BY PHONE, CAN TAKE THINGS DOWN AND MAYBE

17   HEAR MORE CLEARLY, AND YOU'RE WELCOME TO DO THAT FOR

18   QUESTIONING AND IF YOU WANT TO DO OPENING STATEMENTS.  YOU'RE

19   ALSO WELCOME TO STAND UP IF YOU'RE MORE COMFORTABLE.  THAT'S

20   FINE WITH ME TOO.  I JUST WANT YOU TO BE MINDFUL THAT WE HAVE

21   THE COURT REPORTER HERE BY PHONE.

22            BEFORE WE GET STARTED -- WE'RE HERE FOR TRIAL.

23   BEFORE WE GET STARTED, DO WE HAVE ANY MOTIONS THAT ARE

24   PRELIMINARY MATTERS?

25            MR. STITT:  YOUR HONOR, I DO WANT TO ADDRESS THE

```
10:08:53   1   ADMISSIBILITY OF MR. LAZCANO'S POST-ARREST STATEMENT, AND I
           2   THINK THAT -- I'M NOT SURE THAT THE GOVERNMENT WILL OFFER IT,
           3   AND IF THEY DO, PERHAPS WE CAN TAKE IT UP THEN, OR WE CAN DO IT
           4   IN ADVANCE IF THE COURT WOULD PREFER.  I HAD -- JUST SO IF I
           5   COULD ASK THE COURT'S INDULGENCE IF THERE'S SOME POINTS DURING
           6   THE TRIAL WHERE I NEED TO SPEAK WITH MR. LAZCANO, I MAY REQUEST
           7   A RECESS.  SINCE OUR HEARING LAST WEEK, THE COURT ASKED ME TO
           8   MAKE EVERY EFFORT TO SPEAK WITH MR. LAZCANO.  I MADE THE ONLY
           9   AVAILABLE RESERVATION FOR A PHONE CALL WITH MR. LAZCANO AT THE
          10   MCC BETWEEN WHEN WE WERE IN COURT LAST WEEK AND TODAY.  THE MCC
          11   DID NOT CALL.  I E-MAILED THE LEGAL DEPARTMENT.  THERE WAS NO
          12   RESPONSE.  I CALLED THE LEGAL DEPARTMENT'S PHONE NUMBER TO
          13   LEAVE A VOICEMAIL TO ASK ABOUT THE CALL.  THE VOICEMAIL WAS
          14   FULL.  THEY HAD NOT RESPONDED AS OF TODAY.  THE MARSHAL SERVICE
10:09:45  15   ALSO PRODUCED MR. LAZCANO DOWNSTAIRS AT 8:45 INSTEAD OF THE
          16   7:30 OR 8:00 THAT WE THOUGHT WOULD BE POSSIBLE, AND THEN HE WAS
          17   BROUGHT UP AT 9:30.  SO BETWEEN LAST WEEK AND TODAY, I'VE
          18   TALKED TO HIM FOR 45 MINUTES, WHICH I THINK IS ENOUGH, BUT I
          19   DON'T ONE HUNDRED PERCENT KNOW.  I THINK SO.  BUT THAT'S WHY I
          20   WOULD ASK, PERHAPS, IF WE COULD HAVE A RECESS IF NEEDED AND
          21   THEN I CAN FINISH WHATEVER NEEDS TO BE DONE.
          22        THE COURT:  YES, I'M HOPING WE GET THIS ALL FINISHED
          23   BY NOON, BUT I DO HAVE TIME THIS AFTERNOON IF IT NEEDS TO GO
          24   OVER AN HOUR OR SO.
          25        MR. STITT:  THANK YOU.
```

10:10:19  1        THE COURT:  OKAY.  SO I WOULD LIKE TO ADDRESS THE

2  ISSUE OF THE STATEMENT DURING TRIAL.  DO YOU INTEND TO ENTER

3  THAT POST-ARREST STATEMENT, MR. BENJAMIN?

4        MR. BENJAMIN:  NOT THE VIDEO OF THE POST-ARREST

5  ITSELF, BUT THE AGENT WOULD BE TESTIFYING TO THE SUBSTANCE OF

6  IT SO I THINK IT WOULD MAKE SENSE GIVEN THE CIRCUMSTANCES OF

7  IT, AS FAR AS THAT TESTIMONY.

8        THE COURT:  AND I THINK THAT THE EASIEST WAY, THE

9  FASTEST WAY TO ADDRESS IT WILL BE TO HAVE YOU LAY THE

10  FOUNDATION; AND THEN MR. STITT, YOU CAN MAKE ANY OBJECTIONS YOU

11  THINK ARE APPROPRIATE, AND THEN I'LL RULE ON IT AS THE EVIDENCE

12  COMES IN.

13        MR. STITT:  OKAY.  WELL, I MAY HAVE AFFIRMATIVE

14  EVIDENCE WITH RESPECT TO THE VIDEO AND ITS ADMISSIBILITY UNDER

10:10:51 15  MIRANDA SO I JUST --

16        THE COURT:  OKAY.  WE'LL ADDRESS THOSE ISSUES WHEN

17  THEY COME UP.  OKAY.  GO AHEAD.

18        MR. BENJAMIN:  I HAVE A MECHANICAL QUESTION IN TERMS

19  OF IN-COURT IDENTIFICATION.  SO OBVIOUSLY, EVERYONE IS WEARING

20  MASKS AS APPROPRIATE UNDER C.D.C. GUIDELINES.  IN THE EVENT --

21  I DON'T KNOW YET WHETHER THE WITNESSES WILL BE ABLE TO IDENTIFY

22  THE DEFENDANT WITH A MASK.  WHAT IS THE COURT'S PREFERENCE IN

23  DOING IN-COURT IDENTIFICATIONS DURING THIS TIME BECAUSE I KNOW

24  IT VARIES COURT TO COURT?

25        THE COURT:  HERE'S WHAT WE DID LAST TIME:  WE HAD

10:11:29   1   EVERYONE IN THE COURTROOM REMOVE THEIR MASK WHEN AN IN-COURT

2   IDENTIFICATION WAS MADE.

3            MR. STITT:  I HAVE NO OBJECTION TO THAT.

4            THE COURT:  OKAY.  THAT'S WHAT WE'LL DO.  IT'S JUST

5   FOR JUST ONE SECOND.  EVERYONE HAS TO HOLD THEIR BREATH.  JUST

6   KIDDING.  THAT'S NOT TRUE.  BUT YES, JUST DON'T COUGH WHILE YOU

7   HAVE YOUR MASK OFF.  BUT THAT'S WHAT WE'LL DO, WE'LL HAVE

8   EVERYONE REMOVE THEIR MASK FOR A VERY SHORT, BRIEF PERIOD OF

9   TIME FOR THAT IDENTIFICATION.

10            MR. BENJAMIN:  YES, YOUR HONOR.

11            THE COURT:  OKAY.  ANY -- ARE WE GOING TO DO OPENING

12   STATEMENTS?

13            MR. BENJAMIN:  THE GOVERNMENT WOULD WAIVE OPENING

14   STATEMENTS, YOUR HONOR.

10:11:52   15            THE COURT:  WAIVE?  OKAY.

16            MR. STITT:  SAME, YOUR HONOR.

17            THE COURT:  OKAY.  SO WE'LL GO RIGHT INTO THE

18   GOVERNMENT'S CASE-IN-CHIEF.  DO YOU WANT TO CALL YOUR FIRST

19   WITNESS?

20            MR. BENJAMIN:  YES, YOUR HONOR.  THE GOVERNMENT CALLS

21   AGENT RYAN COURTNEY TO THE STAND.

22            THE COURT:  AND THE STAND IS IN A VERY UNUSUAL SPOT.

23   WE'RE GOING TO PUT THE WITNESS, IF IT'S OKAY, MR. BENJAMIN,

24   WE'LL HAVE THE WITNESS SIT -- WE'LL HAVE THE WITNESS SIT THERE

25   TO TESTIFY SO THAT WE HAVE AN ADEQUATE DISTANCING FROM THE

10:12:18  1  BENCH.

2          MR. BENJAMIN:  AND YOUR HONOR, I DID WIPE THE CHAIR

3  --

4          THE COURT:  PERFECT.

5          (OATH ADMINISTERED.)

6          THE CLERK:  PLEASE STATE YOUR FULL NAME, SIR.

7          THE WITNESS:  RYAN ALEXANDER COURTNEY.

8          THE COURT:  IS YOUR LAST NAME C-O-U-R-T-N-E-Y?

9          THE WITNESS:  YES, IT IS.

10         THE COURT:  OKAY.  PROCEED.

11         MR. BENJAMIN:  THANK YOU, YOUR HONOR.

12                    DIRECT EXAMINATION

13  BY MR. BENJAMIN:

14  Q.  GOOD MORNING, AGENT COURTNEY.

10:12:58  15  A.  GOOD MORNING.

16  Q.  WHAT DO YOU DO FOR A LIVING?

17  A.  UNITED STATES BORDER PATROL AGENT.

18  Q.  AND HOW LONG HAVE YOU BEEN A BORDER PATROL AGENT?

19  A.  FOR 11 AND A HALF YEARS.

20  Q.  WHAT SORT OF TRAINING DO YOU HAVE THAT QUALIFIES YOU TO BE

21  A BORDER PATROL AGENT?

22  A.  I SPENT SIX MONTHS AT THE FLETC TRAINING CENTER OVER IN

23  ARTESIA, NEW MEXICO.

24  Q.  ALL RIGHT.  WHAT SORT OF TRAINING DID YOU RECEIVE?

25  A.  I DID IMMIGRATION LAW AND INCLUDING FIREARMS TRAINING AND

| | |
|---|---|
| 10:13:30 | 1 |

1  TWO AND A HALF MONTHS OF SPANISH.

2  Q.  ALL RIGHT.  SO LET'S TALK ABOUT SPANISH.  YOU MENTIONED YOU

3  WERE TRAINED IN SPANISH?

4  A.  YES, I WAS.

5  Q.  WERE YOU TRAINED IN HOW TO CONDUCT YOUR BUSINESS IN

6  SPANISH?

7  A.  YES, I WAS; I WAS TRAINED ON HOW TO CONDUCT INTERVIEWS IN

8  SPANISH.

9  Q.  WERE YOU TRAINED IN CONDUCTING WHAT'S CALLED AN IMMIGRATION

10  INSPECTION?

11  A.  YES, I WAS.

12  Q.  WHAT IS AN IMMIGRATION INSPECTION?

13  A.  IMMIGRATION INSPECTION IS THE DETERMINING THE ALIENAGE OF A

14  PERSON AND WHETHER THEY'RE LAWFULLY ABLE TO ENTER THE UNITED

15  STATES.

16  Q.  ALL RIGHT.  WERE YOU TRAINED IN HOW TO CONDUCT THOSE

17  INTERVIEWS IN SPANISH?

18  A.  YES, I WAS.

19  Q.  HAVE YOU EVER IN THE COURSE OF YOUR CAREER AS A BORDER

20  PATROL CONDUCTED THOSE INTERVIEWS IN SPANISH?

21  A.  YES, I HAVE.

22  Q.  APPROXIMATELY HOW MANY TIMES?

23  A.  THOUSANDS.

24  Q.  ALL RIGHT.  ARE YOU ABLE TO CONDUCT THAT -- ARE YOU ABLE TO

25  SPEAK SPANISH WELL ENOUGH TO CONDUCT THOSE INTERVIEWS?

Line 15 timestamp: 10:14:06

10:14:28  1    A. YES, I AM.

         2    Q. DO YOU UNDERSTAND THE RESPONSES YOU'VE GOTTEN IN THOSE

         3    THOUSANDS OF INTERVIEWS YOU'VE DONE?

         4    A. YES, I HAVE.

         5    Q. DOES IT APPEAR TO YOU, BASED ON THE RESPONSES TO THOSE

         6    QUESTIONS, THAT THE PEOPLE YOU WERE SPEAKING TO UNDERSTOOD YOUR

         7    QUESTIONS DURING THOSE INTERVIEWS?

         8    A. YES, THEY DID.

         9    Q. LET'S TALK ABOUT YOUR ASSIGNMENT WITH BORDER PATROL. WHERE

        10    WERE YOU ASSIGNED?

        11    A. I WAS ASSIGNED TO THE CHULA VISTA AREA. I'M PART OF THE

        12    CHULA VISTA STATION STRIKE TEAM.

        13    Q. ALL RIGHT. WHAT IS THE CHULA VISTA AREA? WHAT AREA DOES

        14    THAT COVER?

10:14:58 15    A. THAT COVERS FROM SAN YSIDRO PORT OF ENTRY EAST TO OTAY MESA

        16    PORT OF ENTRY AND ANOTHER FIVE MILES PAST, EAST OF IT.

        17    Q. IS THAT ENTIRE AREA WITHIN THE SOUTHERN DISTRICT OF

        18    CALIFORNIA?

        19    A. YES, IT IS.

        20    Q. AND WHAT ARE YOUR DUTIES? WHAT DO YOU DO AT THE CHULA

        21    VISTA STATION?

        22    A. MY DUTIES ARE TO DETER ENTRY OF ILLEGAL ALIENS TRYING TO

        23    ENTER THE UNITED STATES.

        24    Q. ALL RIGHT. SO WHAT IS IT THAT YOU DO ESSENTIALLY ON A

        25    ROUTINE BASIS?

10:15:29  1  A.  I PATROL THE BORDER.  I RESPOND TO ANY SUSPICIOUS ACTIVITY

2  OR ENTRIES INTO THE UNITED STATES FROM THE BORDER OR

3  APPROXIMATELY TWO OR THREE MILES NORTH OF IT.

4  Q.  OKAY.  NOW I WANT TO DIRECT YOUR ATTENTION SPECIFICALLY TO

5  SUNDAY OCTOBER 18TH AT A LITTLE BEFORE 3:00 IN THE MORNING.

6  WERE YOU ON DUTY THEN?

7  A.  YES, I WAS.

8  Q.  WERE YOU WEARING A BORDER PATROL UNIFORM?

9  A.  YES, I WAS.

10  Q.  AND WERE YOU WITHIN THE CHULA VISTA STATION'S AREA OF

11  RESPONSIBILITY?

12  A.  YES, I WAS.

13  Q.  AROUND 2:50 IN THE MORNING, DID YOU RESPOND TO A CALL IN

14  THAT AREA OF RESPONSIBILITY?

10:16:13 15  A.  YES, I DID.

16  Q.  I WANT TO TALK TO YOU A LITTLE BIT ABOUT THE AREA YOU

17  RESPONDED TO.  RIGHT NEXT TO YOU THERE SHOULD BE A PIECE OF

18  PAPER MARKED 1A, 1B AND 1C.  WOULD YOU TAKE A LOOK AT THOSE AND

19  LOOK UP ONCE YOU HAD A CHANCE TO LOOK AT THEM?

20  A.  OKAY.

21  Q.  DO YOU RECOGNIZE WHAT'S DEPICTED IN 1A THROUGH 1C?

22  A.  1A IS A BLOWN-UP VIEW OF THE CHULA VISTA AREA OPERATION.

23  1B SHOWS THE OTAY MOUNTAINS, AND THEN 1C, THIS AREA IS KNOWN TO

24  THE BORDER PATROL AGENTS AS THE 73 HIGH POINT OR ALSO THE TRUCK

25  TRAIL, OTAY MOUNTAIN TRUCK TRAIL.

10:16:59   1  Q.  ALL RIGHT.  DO THESE DEPICT, ESSENTIALLY, AS YOU SAID, IN

         2  VARIOUS LEVELS OF ZOOM THE AREAS YOU RESPONDED TO ON SUNDAY THE

         3  18TH AROUND 3:00 IN THE MORNING?

         4  A.  YES, THEY DO.

         5  Q.  ARE ALL OF THESE PICTURES TRUE AND ACCURATE REPRESENTATIONS

         6  OF THE AREA AS IT WAS THAT DAY?

         7  A.  YES, THEY ARE, OTHER THAN IT BEING NIGHTTIME AT THAT TIME.

         8  Q.  RIGHT.  SO OTHER THAN THE LIGHTING CONDITIONS AND THESE

         9  APPEARING TO BE DURING THE DAY -- AND AT 3 A.M., WHAT ARE THE

        10  LIGHTING CONDITIONS IN THE MOUNTAINS?

        11  A.  EXTREMELY DARK.

        12  Q.  SO OTHER THAN THESE DEPICTING IT DURING THE DAY, AND IT

        13  BEING 3:00 IN THE MORNING, ARE THESE TRUE AND ACCURATE

        14  DEPICTIONS OF THE AREA AS IT WAS THAT DAY?

10:17:34  15  A.  YES, THEY ARE.

        16  Q.  YOUR HONOR, THE GOVERNMENT WOULD MOVE TO ADMIT 1A THROUGH

        17  1C.

        18           MR. STITT:  NO OBJECTION.

        19           THE COURT:  OKAY.  LET ME MAKE SURE I HAVE MINE

        20  LABELED CORRECTLY BECAUSE I DON'T HAVE A LABEL.  IS THIS --

        21  WHICH ONE IS THIS?

        22           MR. BENJAMIN:  OH, YOUR HONOR, I CAN --

        23           THE COURT:  I CAN DO IT RIGHT HERE.  IT'S NO PROBLEM.

        24  SO THIS IS 1C?

        25           MR. BENJAMIN:  YES, YOUR HONOR.  SO 1A IS THE MOST

| | | |
|---|---|---|
| 10:17:54 | 1 | ZOOMED OUT, AND THEN 1B IS THE MIDDLE AND 1C IS THE -- |
| | 2 | THE COURT:  THIS IS 1A? |
| | 3 | MR BENJAMIN:  1A IS THE MOST ZOOMED OUT, YOUR HONOR. |
| | 4 | THE COURT:  WITH THE MAP ON IT? |
| | 5 | MR. BENJAMIN:  YES. |
| | 6 | THE COURT:  OKAY. |
| | 7 | MR. BENJAMIN:  AND ACTUALLY, FOR CLARITY, I WILL PUT |
| | 8 | IT ON THE ELMO. |
| | 9 | THE COURT:  OKAY.  PERFECT.  SO THAT'S 1A. |
| | 10 | MR. BENJAMIN:  AND THEN 1B IS THIS ONE. |
| | 11 | THE COURT:  GOT IT.  OKAY.  PERFECT.  THANK YOU. |
| | 12 | (EXHIBITS 1A THROUGH 1C ADMITTED.) |
| | 13 | BY MR. BENJAMIN: |
| | 14 | Q.  SO IN LOOKING AT 1A, AGENT COURTNEY, IS THE U.S.-MEXICO |
| 10:18:27 | 15 | BORDER DEPICTED THERE? |
| | 16 | A.  YES, IT IS. |
| | 17 | Q.  AND WHERE IS IT ON THIS MAP? |
| | 18 | A.  IT'S ON THE BOTTOM SECTION, THE LONG YELLOW LINE GOING |
| | 19 | ACROSS. |
| | 20 | Q.  ALL RIGHT.  AND THE AREA YOU RESPONDED TO, WHICH I SUPPOSE |
| | 21 | WOULD BE EASIEST DEPICTED THERE, RIGHT? |
| | 22 | A.  YES, IT WOULD BE. |
| | 23 | Q.  HOW FAR NORTH OF THE BORDER? |
| | 24 | A.  APPROXIMATELY A MILE. |
| | 25 | Q.  AND EAST TO WEST, HOW FAR IS THIS FROM THE NEAREST PORT OF |

| | | |
|---|---|---|
| 10:18:55 | 1 | ENTRY? |
| | 2 | A.   APPROXIMATELY FOUR MILES.   ACTUALLY, THREE MILES EAST. |
| | 3 | Q.   OF WHICH PORT OF ENTRY? |
| | 4 | A.   OTAY MESA PORT OF ENTRY. |
| | 5 | Q.   ALL RIGHT.   AND IS THERE A BORDER FENCE DIRECTLY SOUTH OF |
| | 6 | HERE? |
| | 7 | A.   THERE IS A BORDER FENCE, BUT THERE ARE SOME OPEN AREAS IN |
| | 8 | BETWEEN.   IT'S CURRENTLY UNDER CONSTRUCTION. |
| | 9 | Q.   OKAY.   AND ESSENTIALLY HOW FAR FROM WHERE YOU RESPONDED ARE |
| | 10 | THE BREAKS IN THE FENCE? |
| | 11 | A.   DIRECTLY SOUTH, BUT YOU CAN SEE THE FENCE IN PRETTY MUCH |
| | 12 | ANY WAY YOU CROSS IN THAT AREA. |
| | 13 | Q.   OKAY.   NOW HOW WOULD YOU DESCRIBE THIS AREA THAT'S DEPICTED |
| | 14 | IN THESE PHOTOS?   HOW WOULD YOU DESCRIBE THE AREA YOU RESPONDED |
| 10:19:48 | 15 | TO? |
| | 16 | A.   THE AREA I RESPONDED TO -- PRETTY DENSE, BUSHES AND LOTS OF |
| | 17 | ROCKS, VERY UNSTABLE GROUND, AND IT'S UPHILL TERRAIN. |
| | 18 | Q.   ALL RIGHT.   IS THIS A DENSELY POPULATED AREA? |
| | 19 | A.   NO, IT'S NOT. |
| | 20 | Q.   ARE THERE A LOT OF PEOPLE IN THIS AREA ON A DAY-TO-DAY |
| | 21 | BASIS? |
| | 22 | A.   FOR ILLEGAL ENTRY, YES.   CIVILIANS, DURING THE DAYTIME, |
| | 23 | YES. |
| | 24 | Q.   LET ME BREAK THAT UP AND HAVE YOU EXPLAIN THAT |
| | 25 | STEP-BY-STEP.   SO YOU SAID FOR ILLEGAL ENTRY, YES.   CAN YOU |

10:20:26  1   EXPOUND ON THAT A LITTLE BIT?  HOW OFTEN OR HOW MUCH, HOW MANY

          2   TIMES HAVE YOU ENCOUNTERED PEOPLE CROSSING ILLEGALLY IN THIS

          3   AREA?

          4            MR. STITT:  OBJECTION.  THAT ALSO CALLS FOR EXPERT

          5   TESTIMONY WE HAVEN'T RECEIVED ANY DISCOVERY ON.

          6            THE COURT:  OVERRULED.

          7   BY MR. BENJAMIN:

          8   Q.  YOU CAN ANSWER.

          9   A.  CAN YOU SAY THE QUESTION AGAIN?

         10   Q.  SO BASED SOLELY ON YOUR EXPERIENCE, HOW OFTEN HAVE YOU

         11   ENCOUNTERED PEOPLE WHO ARE CROSSING ILLEGALLY IN THIS AREA?

         12   A.  PROBABLY A COUPLE THOUSAND TIMES.

         13   Q.  AND BASED ON YOUR EXPERIENCE, ARE THERE ROUTINELY PEOPLE

         14   WHO ARE ENTERING ILLEGALLY IN THE AREA?

10:21:02 15            MR. STITT:  OBJECTION.  RELEVANCE.

         16            THE COURT:  OVERRULED.

         17            THE WITNESS:  YES, THERE ARE.

         18   BY MR. BENJAMIN:

         19   Q.  YOU ALSO MENTIONED -- YOU TALK A LITTLE BIT ABOUT

         20   CIVILIANS.  HOW OFTEN DO YOU RUN INTO U.S. CITIZENS IN THIS

         21   AREA?

         22   A.  DURING THE DAYTIME, YOU'LL SEE SEVERAL CIVILIANS DRIVING

         23   THROUGH THE AREA.  I'D SAY MAYBE ONCE EVERY TWO WEEKS YOU'LL

         24   FIND SOMEONE CAMPING IN ONE OF THE PULLOUTS NEAR THE TRUCK

         25   TRAIL.

10:21:26   1   Q.  ALL RIGHT.  AND SO YOU SAID YOU HAVE SEEN U.S. CITIZENS

         2   CAMPING IN THAT AREA?

         3   A.  YES, I HAVE.

         4   Q.  WHEN YOU HAVE ENCOUNTERED CITIZENS CAMPING IN THAT AREA, DO

         5   THEY HAVE CAMPING GEAR WITH THEM?

         6   A.  YES, THEY DO.

         7   Q.  HAVE YOU EVER ENCOUNTERED UNITED STATES CITIZENS HIKING IN

         8   THE AREA AT 3:00 IN THE MORNING?

         9   A.  NO, I HAVE NOT.

        10   Q.  HAVE YOU EVER ENCOUNTERED U.S. CITIZENS HIKING IN THE AREA

        11   WITHOUT ANY LIGHT?

        12   A.  NO, I HAVE NOT.

        13   Q.  ALL RIGHT.  NOW, AS YOU APPROACHED THAT LOCATION, WHAT DID

        14   YOU SEE?  ON SUNDAY THE 18TH, AT AROUND 3:00 IN THE MORNING,

10:21:56  15   WHAT HAPPENED WHEN YOU ARRIVED?

        16   A.  AS I RESPONDED?  IS THAT WHAT YOU'RE SAYING?

        17   Q.  YEAH.

        18   A.  SO I RECEIVED A CALL.  ABOUT APPROXIMATELY SIX TO MORE

        19   ALIENS IN THE AREA KNOWN AS THE 73 HIGH POINT, THEY WERE

        20   HEADING NORTHBOUND TOWARDS IT.  THE 73 HIGH POINT IS THE AREA

        21   WITH THE DIRT ROAD COMING OFF THE TRUCK TRAIL AT THE TOP OF THE

        22   -- OR IN THE MIDDLE OF THE PICTURE.

        23   Q.  SO IN LOOKING AT EXHIBIT 1, SO YOU ARE SAYING THE DIRT

        24   TRAIL?

        25   A.  YES.  WHERE THE DIRT TRAIL IS IN THE MIDDLE OF THE PICTURE,

10:22:33   1    THAT'S WHAT WE CALL THE 73 HIGH POINT.  THEY WERE ADVISING THAT

           2    THERE WERE APPROXIMATELY 60 YARDS SOUTH OF IT.  ME, MYSELF AND

           3    ANOTHER AGENT, AGENT PALACIOS, RESPONDED.  IT TOOK US ABOUT TWO

           4    OR THREE MINUTES TO GET TO THE AREA.  ONCE WE GOT THERE, AGENT

           5    PALACIOS WENT ON THE NORTHERN ROAD WHERE THE 73 HIGH POINT IS,

           6    AND I RESPONDED TO THE PULLOUT THAT IS SOUTH OF THAT AREA AS

           7    YOU'RE GOING UP THE TRUCK TRAIL.  YOU COULD SORT OF SEE IT ON

           8    THE BOTTOM COMING OFF FROM THE CURB.

           9    Q.  FOR CLARITY OF THE RECORD, SINCE YOU HAVE THE ACTUAL

          10    EXHIBIT IN FRONT OF YOU, I'M GOING TO HAND YOU A PEN AND ASK

          11    YOU TO CIRCLE WHERE YOU'RE TALKING ABOUT.

          12    A.  SO THIS IS WHERE THE BORDER PATROL AGENTS CALL THE 73

          13    PULLOUT.  SO I RESPONDED THERE.  USING THE RVSS OPERATOR THAT

          14    WAS USING THE CAMERA THAT FIRST SAW THIS GROUP, HE HAD MYSELF

10:24:07  15    GOING FROM THE SOUTH MOVING UP TO THE NORTH TOWARDS THEM WHILE

          16    AGENT PALACIOS WAS ON THE NORTHERN SIDE GOING SOUTH.

          17    Q.  WHAT HAPPENED AT THAT POINT, OR WHAT DID YOU DO NEXT?

          18    A.  SO AS WE WERE GETTING OUT OF THE VEHICLES, THEY ADVISED

          19    THAT THE GROUP WAS AROUND NINE TO TEN PEOPLE NOW.  WE GOT OUT

          20    OF THE VEHICLES, AND I STARTED HEADING NORTH UP TOWARDS THE 73

          21    HIGH POINT.  IT TOOK A LITTLE BIT TO CLIMB UP THERE.  ONCE I

          22    GOT TO THE TOP, THE RVSS OPERATOR ADVISED THAT I ALREADY PASSED

          23    UP THE GROUP AND THAT THEY WERE ACTUALLY, THEY WERE SOUTH OF

          24    ME.  I ENDED UP MEETING UP WITH AGENT PALACIOS AND WE BOTH JUST

          25    WENT SOUTHBOUND KIND OF PARALLEL TO EACH OTHER AS WE WENT

10:25:11   1   DOWN.

2   Q.  AND JUST FOR CLARITY SAKE, YOU'RE TALKING ABOUT NORTH,

3   SOUTH AND ALSO UP AND DOWN.  DID THE SLOPE GO -- ESSENTIALLY,

4   YOU WERE DESCENDING FROM NORTH TO SOUTH?

5   A.  YES.  FROM NORTH TO SOUTH, WE WOULD BE DESCENDING

6   DOWNHILL.

7   Q.  OKAY.

8   A.  SO FROM THE DIRT ROAD, I WOULD BE GOING DOWN.  AS WE WERE

9   GOING DOWN, THE RVSS OPERATOR ADVISED US AS WE WERE GETTING

10   CLOSE TO THE GROUP.  AS WE WERE GOING DOWN, I GOT AHEAD OF

11   AGENT PALACIOS.  THE RVSS OPERATOR INFORMED ME THAT WE WERE

12   GETTING CLOSE TO THE GROUP, THAT THEY WERE OFF TO MY LEFT SIDE

13   WHICH WOULD HAVE BEEN EAST OF ME.  AS SOON AS I GOT NEAR THE

14   GROUP, I SAW TWO SUBJECTS ABSCOND.  ONE WENT SOUTHWEST AND --

10:26:04   15   OR SOUTHEAST AND ONE WENT SOUTHWEST.

16   Q.  I WANT TO STOP YOU THERE AND TALK ABOUT APPROACHING THE

17   GROUP.  IT SOUNDS LIKE -- DID YOU SEE A GROUP OF PEOPLE?

18   A.  I SAW -- IT LOOKED LIKE APPROXIMATELY TWO OR THREE PEOPLE.

19   I STILL DIDN'T HAVE MY LIGHT ON AT THIS POINT SO IT WAS

20   COMPLETE DARKNESS.

21   Q.  SORRY ABOUT THAT.

22   A.  IT WAS COMPLETE DARKNESS.  SO I DID SEE A COUPLE FACES.  AS

23   I GOT CLOSE, I DEFINITELY SAW THE TWO GUYS THAT STOOD UP AND

24   RAN.  BECAUSE THERE WAS STILL SUBJECTS SITTING ON THE GROUND, I

25   FIRST WERE GOING TO APPROACH THEM.  AT THIS POINT, I DID TURN

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:26:47 | 1  | ON MY LIGHT.                                                  |
|          | 2  | Q.  NOW WHY IS IT THAT YOU DIDN'T TURN ON YOUR LIGHT UP UNTIL |
|          | 3  | THIS POINT?                                                   |
|          | 4  | A.  NORMALLY, YOU DON'T WANT TO INITIALLY TURN ON YOUR LIGHT  |
|          | 5  | TOO FAR AWAY FROM THE GROUP OF INDIVIDUALS THAT ARE PEOPLE YOU |
|          | 6  | SUSPECT ARE ILLEGAL IMMIGRANTS BECAUSE THEY USUALLY ABSCOND.  |
|          | 7  | Q.  ALL RIGHT.  SO I JUST WANT TO PAUSE REAL QUICK AT WHERE YOU |
|          | 8  | FIRST APPEAR AND YOU SAY TWO PEOPLE RAN AWAY.                 |
|          | 9  | A.  YEAH.                                                     |
|          | 10 | Q.  WHEN YOU APPROACH THIS GROUP AND YOU'RE SEEING THEM FOR THE |
|          | 11 | FIRST TIME, DID ANY OF THEM TRY TO SHOUT AND GET YOUR         |
|          | 12 | ATTENTION?                                                    |
|          | 13 | A.  NO, THEY DID NOT.                                         |
|          | 14 | Q.  DID ANYBODY TRY TO FLAG YOU DOWN TO GET YOUR ATTENTION?   |
| 10:27:28 | 15 | A.  NO, THEY DID NOT.                                         |
|          | 16 | Q.  DID ANYBODY GET UP AND APPROACH YOU AND SAY THEY WANT TO  |
|          | 17 | TURN THEMSELVES IN TO THE BORDER PATROL?                      |
|          | 18 | A.  NO, THEY DID NOT.                                         |
|          | 19 | Q.  NOW YOU'RE BY THIS GROUP -- WELL, FIRST OFF, AS YOU'RE    |
|          | 20 | APPROACHING THEM, DID ANY OF THEM HAVE ANY LIGHT?            |
|          | 21 | A.  NO, THEY DID NOT.                                         |
|          | 22 | Q.  AND ONCE YOU WERE APPROACHING AND NEXT TO THEM, DID ANY OF |
|          | 23 | THEM HAVE ANY CAMPING GEAR?                                   |
|          | 24 | A.  NO, THEY DID NOT.                                         |
|          | 25 | Q.  SO LET'S NOW TURN TO YOU SAID YOU APPROACHED THEM AND YOU |

| | |
|---|---|
| 10:27:51 | 1 |

10:27:51  1    WERE DEALING WITH THE PEOPLE WHO WERE STILL SEATED.  SO WHAT

2    HAPPENED AT THAT POINT?

3    A.  SO AS I APPROACHED THE -- THERE WAS THREE SUBJECTS THAT

4    WERE SITTING ON THE GROUND.  AS I APPROACHED THEM, I TOLD THEM

5    IN THE SPANISH LANGUAGE...(WHEREUPON, THE WITNESS IS SPEAKING

6    SPANISH.)

7    Q.  AND WHAT DOES THAT MEAN?

8    A.  IT'S AN ABBREVIATED TERM FOR IMMIGRATION, I AM IMMIGRATION.

9    I TOLD THEM, DO NOT MOVE IN THE SPANISH LANGUAGE...(WHEREUPON,

10   THE WITNESS IS SPEAKING SPANISH.)  THEN I PROCEEDED TO HANDCUFF

11   TWO OF THEM.

12   Q.  WHY IS IT THAT YOU HANDCUFFED THOSE TWO INDIVIDUALS?

13   A.  FOR SAFETY REASONS.  I HAD TWO PEOPLE ALREADY ABSCOND FROM

14   ME.  I DIDN'T KNOW EXACTLY WHERE THEIR LOCATION WAS OR WHETHER

10:28:51 15   THEY WERE GOING TO COME BACK TOWARDS ME.  SO I WANTED TO LIMIT

16   THE MOVEMENT OF TWO OF THE SUSPECTS AT THE TIME.

17   Q.  NOW, YOU SAID THAT THERE WAS THREE PEOPLE RIGHT THERE IN

18   THAT GROUP.  WHERE WAS THE OTHER AGENT WHO YOU SAID YOU WERE

19   WITH?

20   A.  HE WAS FURTHER NORTH FROM ME APPARENTLY.  WHICH I FOUND OUT

21   AFTERWARDS, AFTER I HAD MY FOUR SUBJECTS WITH ME, THAT HE

22   ACTUALLY APPREHENDED FOUR NORTH OF ME, APPROXIMATELY TEN

23   YARDS.

24   Q.  SO AT THE TIME THAT YOU WERE DEALING WITH THESE PEOPLE AND

25   YOU SAID YOU PUT HANDCUFFS ON THEM, WAS HE WITH YOU?

10:29:27  1    A.  NO, HE WAS NOT.

        2    Q.  SO YOU HANDCUFFED THE TWO PEOPLE.  WHAT HAPPENED NEXT?

        3    A.  NEXT, THERE WAS A THIRD SUBJECT NEXT TO THE OTHER TWO.  I

        4    DIDN'T HAVE AN EXTRA PAIR OF CUFFS AT THE TIME.  AND THEN I

        5    FOUND A FOURTH SUBJECT THAT WAS FURTHER EAST FROM THEM IN A

        6    BUSH; SO I TOLD THEM TO COME OUT AND TO SIT NEXT TO THE THIRD

        7    GUY.  I WAITED FOR MY PARTNER TO COME, WHICH ONCE HE CAME WITH

        8    THE FOUR SUBJECTS THAT HE APPREHENDED, HE HANDED ME SOME

        9    FLEXI-CUFFS, AND THEN I ZIP-TIED BOTH THE THIRD AND FOURTH GUY

       10    TOGETHER.

       11    Q.  ALL RIGHT.

       12    A.  AT THAT POINT, I TOLD AGENT PALACIOS IF HE COULD KEEP AN

       13    EYE ON THEM AS I WENT TO GO LOOK FOR THE NINTH AND TENTH

       14    SUBJECTS IN THE GROUP.  HE WATCHED THEM.  IT WAS A TOTAL OF

10:30:30 15    EIGHT SUBJECTS AT THE TIME.  AND I PROCEEDED TO WALK DOWNHILL

       16    SOUTH FROM OUR LOCATION.  I WAS LOOKING FOR SIGN OR BREAKS IN

       17    BRUSH IN ORDER TO FIGURE OUT THE DIRECTION THAT ONE OF THEM

       18    TOOK.  I SAW THE MARKS ON THE GROUND FOR FOOTPRINTS SHOWING

       19    SOMEONE RUNNING DOWNHILL.  I FOLLOWED THEM.  AS I WAS GOING

       20    DOWNHILL, ONE SUBJECT STOOD UP.  HE WAS ABOUT TEN YARDS AWAY

       21    FROM ME AT THE TIME, AND HE STARTED RUNNING DOWNHILL SOUTHBOUND

       22    FROM ME.

       23            I PROCEEDED TO RUN TOWARDS HIM TELLING HIM NOT TO

       24    MOVE.  I TOLD HIM...(WHEREUPON, THE WITNESS IS SPEAKING

       25    SPANISH)...IN SPANISH TO STOP.  HE KEPT GOING.  AS I WAS

| | |
|---|---|
| 10:31:23 1 | RUNNING BEHIND HIM TRYING TO CATCH UP, HE ENDED UP FALLING, |
| 2 | LOSING HIS FOOTING AND FALLING.  AT THE TIME, I WAS KIND OF |
| 3 | FURTHER WEST FROM HIM SO I DIDN'T ACTUALLY SEE HIM FALL; BUT I |
| 4 | SAW THE DIRT AND EVERYTHING FLY UP, AND I COULD TELL THAT HE |
| 5 | DEFINITELY TOOK A SPILL ON THE WAY DOWN.  AS I APPROACHED, I |
| 6 | DIDN'T IMMEDIATELY GO RIGHT TO HIM.  I WAS KIND OF KEEPING MY |
| 7 | DISTANCE TO ASSESS WHETHER HE WAS ACTUALLY HURT OR WHETHER HE |
| 8 | WAS GOING TO TRY TO ABSCOND OR WHAT WAS GOING TO HAPPEN.  AS I |
| 9 | GOT CLOSER, I COULD SEE THAT THE SUBJECT WHO, THE SUBJECT WAS, |
| 10 | HE HAD LACERATIONS ON HIS HAND.  HE WAS HAVING DIFFICULTY |
| 11 | BREATHING AT THE TIME.  IT LOOKED AS IF THE WIND GOT KNOCKED |
| 12 | OUT OF HIM WHEN HE FELL. |
| 13 | Q.  AT THIS POINT, HOW CLOSE ARE YOU TO THIS PERSON? |
| 14 | A.  I WOULD SAY MAYBE FOUR OR FIVE YARDS AWAY FROM HIM. |
| 10:32:32 15 | Q.  IT APPEARED THAT HE WAS LEGITIMATELY HURT SO I GOT CLOSER. |
| 16 | AS I APPROACHED HIM, I COULD TELL THAT HE WAS IN DISTRESS.  HE |
| 17 | KEPT GRIPPING MY PANT LEG.  I COULD TELL THAT, ALTHOUGH HE HAD |
| 18 | A LOT OF WOUNDS, THAT THEY WERE SUPERFICIAL, THAT WHEN HE |
| 19 | KNOCKED THE WIND OUT OF HIMSELF THAT HE WOULD REGAIN HIS |
| 20 | BREATH.  AND I COULD TELL THAT HE STILL COULDN'T BREATHE AT THE |
| 21 | TIME, AND I TOLD HIM TO RELAX SO THAT -- IT SEEMED LIKE HE WAS |
| 22 | ALMOST GOING TO GO INTO SHOCK AT THE TIME. |
| 23 | Q.  I'M GOING TO STOP YOU THERE REAL QUICK.  AT THIS POINT, YOU |
| 24 | SAID HE WAS GRIPPING YOUR PANT LEG.  COULD YOU CLEARLY SEE THE |
| 25 | MAN'S FACE? |

10:33:21   1   A.   YES, I COULD.

           2   Q.   I WANT YOU TO TAKE A LOOK AROUND THE COURTROOM AND SEE IF

           3   YOU RECOGNIZE ANYONE HERE TODAY AS BEING THAT PERSON.

           4            THE COURT:   AT THIS POINT, I WILL ASK EVERYONE IN THE

           5   COURTROOM TO REMOVE YOUR MASK BRIEFLY.

           6            THE WITNESS:   YES, HE'S SITTING OVER THERE IN THE

           7   BLACK SHIRT.

           8            MR. BENJAMIN:   YOUR HONOR, MAY THE RECORD REFLECT THE

           9   WITNESS HAS IDENTIFIED THE DEFENDANT?

          10            THE COURT:   IT WILL SO REFLECT.   EVERYONE CAN PLEASE

          11   PUT THEIR MASKS BACK ON.   THANK YOU.

          12   BY MR. BENJAMIN:

          13   Q.   SO YOU SAID HE WAS GRIPPING YOUR PANT LEG AND ASKING YOU TO

          14   HELP HIM AND THAT HIS WOUNDS APPEARED TO BE SUPERFICIAL.   WHAT

10:33:58  15   WERE YOU MAKING THAT DETERMINATION BASED OFF?

          16   A.   BASED OFF A NUMBER OF ALIENS THAT HAVE HAD THAT, FALLEN

          17   FROM ABSCONDING FROM ME.

          18   Q.   YOU MENTIONED EARLIER THIS IS SORT OF -- I DON'T WANT TO

          19   PARAPHRASE YOUR WORDS TOO MUCH.   WHAT'S THE TERRAIN LIKE IN

          20   THIS AREA?

          21   A.   EXTREMELY UNSTABLE AND DENSE, BUSHES.

          22   Q.   SO HAVE YOU SEEN PEOPLE FALL HERE BEFORE WHEN THEY RUN?

          23   A.   YES, I HAVE.

          24   Q.   OKAY.   SO AT THIS POINT YOU SAID HE APPEARED TO BE IN

          25   SHOCK.   SO WHAT DID YOU DO?   WHAT HAPPENED NEXT?

10:34:32  1    A.  ESSENTIALLY, I KEPT TELLING HIM TO RELAX IN THE SPANISH

        2    LANGUAGE, TO CALM DOWN.  I KEPT ASKING HIM TO LET GO OF MY

        3    PANTS.  AT THIS TIME, EVEN THOUGH HE APPEARED TO BE INJURED, I

        4    DIDN'T KNOW WHETHER HE WOULD TRY TO ASSAULT ME OR WHAT WOULD

        5    HAPPEN.  SO I WANTED TO, ALTHOUGH HELP HIM, I WANTED TO TRY TO

        6    MAKE SURE THAT I HAD A LITTLE DISTANCE FROM HIM FROM BEING ABLE

        7    TO DO ANYTHING.  ONCE I COULD TELL HE REGAINED HIS BREATH AND

        8    THAT HE WAS ABLE TO BREATHE, THEN I STARTED CHECKING HIS WOUNDS

        9    ON HIS HANDS AND HIS ARMS.  I SAW HE HAD A LARGE BRUISE ON HIS

       10    ARM AT THE TIME.  I DIDN'T KNOW WHETHER IT WAS BROKEN BUT WHILE

       11    I WAS TALKING TO HIM I COULD SEE THAT HE KEPT PUTTING WEIGHT ON

       12    HIS ARM; SO IT APPEARED IT WASN'T BROKEN, THAT HE WAS ABLE TO

       13    PUT WEIGHT ON IT.  AT THE TIME, I ASKED FOR ANOTHER AGENT TO

       14    RESPOND TO HELP US TO MOVE ALL NINE SUBJECTS.  SO I HAD AGENT

10:35:49 15    DEL RIO, HE CAME.  I BROUGHT THE SUBJECT FURTHER NORTH UP TO

       16    WHERE THE GROUP WAS; AND FROM THERE, ONCE AGENT DEL RIO SHOWED

       17    UP, I ESCORTED THE SUBJECT DOWN TOWARDS THE TRUCK TRAILS,

       18    SOUTH.

       19    Q.  I JUST WANT TO BACK UP A LITTLE BIT.  SO YOU SAID YOU

       20    ESCORTED A SUBJECT NORTH.  THAT'S THE DEFENDANT; CORRECT?

       21    A.  YES, IT IS.

       22    Q.  HE WAS ON THE GROUND.  WAS HE ABLE TO STAND ON HIS OWN TWO

       23    FEET?  OR DID YOU HELP HIM?  HOW DID HE GET --

       24    A.  HE WAS ABLE TO STAND ON HIS OWN TWO FEET.

       25    Q.  AND AS HE WAS MOVING UP, DID YOU HANDCUFF HIM?

10:36:27   1   A.   NO, I DID NOT.

2   Q.   WHY NOT?

3   A.   BECAUSE HE HAD INJURIES TO HIS ARM, I FELT THAT IT WOULD

4   FURTHER AGGRAVATE IT.  IT WAS BROKEN, AND IT JUST DIDN'T FEEL

5   LIKE IT WAS NECESSARY AT THE TIME TO HANDCUFF HIM.

6   Q.   AT ANY POINT WHEN YOU WERE UP ON THIS MOUNTAIN DID YOU CALL

7   FOR ANY SORT OF MEDICAL ASSISTANCE?  FIRST OFF, ARE YOU A

8   TRAINED MEDICAL PERSONNEL?

9   A.   NO.  I'M ONLY A FIRST RESPONDER.

10   Q.   DID YOU MAKE ANY CALLS TO ANYONE FOR MEDICAL ASSISTANCE?

11   A.   YES, I DID.

12   Q.   WHEN WAS THAT?

13   A.   ONCE I BROUGHT THE SUBJECT BACK UP TO THE REST OF THE EIGHT

14   SUBJECTS IN THE GROUP, I CONTACTED -- I ASKED FOR A BORDER

10:37:17   15   PATROL EMT TO RESPOND, AND AGENT TAM SAID THAT HE WOULD BE ON

16   HIS WAY.  THEN WE PROCEEDED TO BRING HIM SOUTHBOUND ONTO THE

17   OTAY TRUCK TRAIL.

18   Q.   WHY IS IT THAT YOU HAD TO BRING HIM DOWN TO THE TRUCK

19   TRAIL?

20   A.   MAINLY FOR SAFETY REASONS.  IT'S A MORE SECURE AREA.  THE

21   GROUNDING WHERE THE GROUP WAS AT WAS -- THE TERRAIN WAS ROCKY.

22   PLUS, WE STILL HAD AN OUTSTANDING SUBJECT IN THE GROUP AND

23   BECAUSE OF THE LARGE AMOUNT OF PEOPLE IN THE GROUP, WE HAD NINE

24   PEOPLE AND ONLY AT THE TIME THREE AGENTS, WE WERE SORT OF

25   OUTNUMBERED.  SO WE NEEDED TO MAKE SURE THAT IT WAS IN AN AREA

10:38:13  1  THAT WAS MORE SECURE.

2  Q.  WELL, IN YOUR EXPERIENCE FROM DEALING WITH THE BORDER

3  PATROL EMT IN A SITUATION, WOULD THEY RESPOND TO THE MIDDLE OF

4  THE MOUNTAIN OR WOULD THEY RESPOND TO THE ROAD?

5  A.  THEY WOULD RESPOND TO THE ROAD.

6  Q.  SO IF THE DEFENDANT NEEDED MEDICAL ATTENTION, WOULD HE HAVE

7  TO GO DOWN TO THAT TRUCK TRAIL?

8  A.  YES, HE WOULD, IF HE WAS ABLE TO DO SO.  SO AGENT TAM DID

9  TELL US TO MEET HIM AT THE ROAD SO IT'S EASIER FOR HIM TO

10  ASSESS HIS INJURIES.  SO WE BROUGHT HIM DOWN TO THE ROAD.

11  Q.  AS THE DEFENDANT WAS WALKING DOWN THE HILL, WHAT WERE YOU

12  DOING?

13  A.  I WAS WALKING NEXT TO HIM.

14  Q.  ALL RIGHT.  AND WERE YOU MAKING SURE HE DIDN'T HAVE ANY

10:39:02  15  FURTHER FALLS OR INJURIES?

16  A.  YES, I WAS.

17  Q.  DURING THE TIME YOU WERE WALKING BOTH FROM WHERE YOU FOUND

18  HIM --

19            THE CLERK:  WAIT.  HOLD ON.

20            THE COURT:  HOLD ON.  ONE SECOND.  WE'VE BEEN HAVING

21  A TECHNICAL ISSUE WITH THIS.

22            (RECESS.)

23            THE COURT:  WE'LL NOW GO BACK ON THE RECORD AND

24  CONTINUE WITH THE QUESTIONING, THE DIRECT EXAMINATION OF AGENT

25  COURTNEY.

| | | |
|---|---|---|
| 10:54:00 | 1 | MR. BENJAMIN:  DO WE KNOW WHEN IT CUT OUT? |
| | 2 | THE COURT:  IT WON'T MATTER.  THE COURT REPORTER IS |
| | 3 | STILL ON THE PHONE, BUT THIS IS A BACKUP SO -- AND I THINK THE |
| | 4 | COURT REPORTER FELT CONFIDENT SHE WAS ABLE TO CAPTURE |
| | 5 | EVERYTHING UP TO THAT MOMENT, SO. |
| | 6 | BY MR. BENJAMIN: |
| | 7 | Q.  SO WHEN WE LEFT OFF YOU WERE EXPLAINING THAT YOU WERE |
| | 8 | WALKING DOWN WITH THE DEFENDANT DOWN THIS HILL.  DID YOU SPEAK |
| | 9 | TO HIM WHEN WHEN YOU WERE WALKING DOWN THE HILL? |
| | 10 | A.  AS WE WERE WALKING DOWN THE ROAD?  NO, I DID NOT. |
| | 11 | Q.  ALL RIGHT.  WERE YOU ASKING HIM ANY SORT OF QUESTIONS OR |
| | 12 | QUESTIONING HIM IN ANY WAY WHILE HE WAS TRYING TO GET DOWN THE |
| | 13 | HILL? |
| | 14 | A.  NO, I WAS NOT. |
| 10:54:43 | 15 | Q.  AT ANY POINT IN YOUR INTERACTION WITH HIM FROM WHERE YOU |
| | 16 | FOUND HIM UNTIL GETTING TO THE BOTTOM, DID HE EVER INDICATE |
| | 17 | THAT HE WAS HAVING DIFFICULTY WITH THE DIFFICULT TERRAIN OR HE |
| | 18 | HAD BEEN HAVING DIFFICULTY AT ANY POINT? |
| | 19 | A.  WELL, I MEAN, THROUGHOUT FROM WHEN I GOT TO HIM TO BRING |
| | 20 | HIM UP TO THE GROUP AND BACK DOWN TO THE ROAD, HE KEPT TALKING |
| | 21 | ABOUT HOW DIFFICULT IT WAS, LIKE HOW MUCH PAIN HE HAS, HIS |
| | 22 | INJURIES.  I HAD HIM AT THE FRONT OF THE GROUP BECAUSE, AT THE |
| | 23 | TIME, BECAUSE HE WAS HURT I KNEW IT WOULD TAKE A WHILE FOR HIM |
| | 24 | TO GET DOWN.  SO WE JUST TOOK OUR TIME AS WE WENT DOWN, AND I |
| | 25 | JUST WALKED DOWN NEXT TO HIM. |

10:55:30   1   Q.  ALL RIGHT.  DID HE INDICATE WHETHER THIS HAD BEEN BOTHERING

            2   HIM ESSENTIALLY BEFORE YOU GUYS FOUND HIM AS WELL?

            3   A.  HE DID INDICATE THAT HE -- LET ME THINK.  WHEN I INITIALLY

            4   GOT TO HIM, ONCE HE WAS ABLE TO REGAIN HIS BREATH, HE SAID HOW

            5   HE HAD A PREVIOUS INJURY TO HIS LEG AND THAT IT WAS HURT.  HE

            6   LIFTED UP HIS PANT LEG, AND I REMEMBER SEEING A SCAR ALONG HIS

            7   KNEE.  I THINK IT WAS THE LEFT LEG.

            8   Q.  SO WHEN YOU GOT DOWN TO THE BOTTOM OF THE HILL, WHAT

            9   HAPPENED NEXT?

           10   A.  ONCE WE GOT TO THE BOTTOM OF THE HILL, I HAD HIM --

           11   EVERYONE -- KIND OF LINE UP ON THE NORTH SIDE OF THE ROAD TO

           12   SIT DOWN.  THE DEFENDANT OVER HERE WAS SITTING ON THE FAR WEST

           13   SIDE OF THE GROUP, KIND OF SEPARATED FROM THEM, LAYING DOWN.

           14   Q.  WHY WAS IT THAT HE WAS A LITTLE BIT SEPARATED?

10:56:44  15   A.  WE JUST GAVE HIM A LITTLE MORE ROOM.  THAT'S PRETTY MUCH

           16   WHERE HE GOT TO WHEN WE GOT TO THE BOTTOM, AND HE JUST LAID

           17   DOWN AND WE JUST KEPT HIM KIND OF FURTHER AWAY FROM THE GROUP

           18   JUST SO HE HAD SOME ROOM.

           19   Q.  OKAY.  YOU SAID HE WAS LAYING DOWN RATHER THAN SITTING?

           20   A.  YES.  HE WAS LAYING WITH HIS BACK AGAINST THE HILL, LAYING

           21   BACK.  AND THEN THROUGHOUT THIS POINT WE WERE STILL WAITING FOR

           22   THE EMT TO ARRIVE.  AS WE WERE WAITING, I ASKED TO SEE IF

           23   EVERYONE HAD DOCUMENTS ON THEM IN THE SPANISH LANGUAGE AND

           24   THEN --

           25   Q.  DID THE DEFENDANT GIVE YOU ANY FORM OF IDENTIFICATION WHEN

10:57:29   1   YOU ASKED HIM FOR DOCUMENTS?

         2   A.   YES, HE DID.

         3   Q.   NOW, NEXT TO YOU THERE'S AN ITEM MARKED GOVERNMENT'S

         4   EXHIBIT 2, IF YOU COULD TAKE A LOOK AT THAT.   WHAT IS THAT?

         5   A.   THIS IS A MEXICO IDENTIFICATION CARD.

         6   Q.   IS THAT THE IDENTIFICATION THAT THE DEFENDANT PROVIDED TO

         7   YOU THAT DAY?

         8   A.   YES, IT IS.

         9   Q.   IS THAT CARD IN THE SAME OR SUBSTANTIALLY THE SAME

        10   CONDITION AS IT WAS WHEN HE HANDED IT TO YOU ON OCTOBER 18TH,

        11   OTHER THAN HAVING AN EXHIBIT STICKER PLACED ON IT?

        12   A.   I MEAN, I CAN'T SAY I KNOW THE SPECIFIC CARDS BECAUSE IT

        13   WAS SO MANY PEOPLE.   I DO KNOW THAT HE DID HAND ME THIS CARD.

        14   THAT'S ABOUT IT.

10:58:18  15   Q.   I GUESS, TO CLARIFY, DOES IT APPEAR THAT THAT CARD IS IN

        16   THE SAME CONDITION THAT IT WAS, OR DOES IT APPEAR THAT IT HAS

        17   BEEN ALTERED, OTHER THAN HAVING AN EXHIBIT STICKER ON IT?

        18   A.   IT APPEARS TO BE THE SAME.

        19   Q.   YOUR HONOR, THE GOVERNMENT WOULD MOVE TO ADMIT GOVERNMENT

        20   EXHIBIT 2.

        21            THE COURT:   ANY OBJECTION?

        22            MR. STITT:   YES.   I OBJECT FOR TWO BASES.   FIRST,

        23   IT'S HEARSAY; IT HASN'T BEEN AUTHENTICATED, TRANSLATED OR SHOWN

        24   TO BE A VALID GOVERNMENT-ISSUED DOCUMENT, CERTAINLY NOT A

        25   UNITED STATES DOCUMENT THAT WOULD BE ACCEPTED AS PART OF THE,

10:58:51  1   YOU KNOW, SELF-AUTHENTICATING RULE UNDER THE EVIDENCE CODE.

2   SIMILARLY, I DON'T THINK WE ESTABLISHED THAT THE AGENT CAN READ

3   SPANISH.  WE TALKED ABOUT HIS TWO-AND-A-HALF-MONTH CLASS AND

4   DOING ORAL SPANISH INTERROGATIONS FOR IMMIGRATION QUESTIONS,

5   BUT THIS IS FAR DIFFERENT.  SO YOU WERE ASKING HIM TO IDENTIFY

6   THE CONTENTS OF THE CARD.  I WOULD WITHDRAW MY OBJECTION IF

7   IT'S MERELY BEING INTRODUCED FOR DEMONSTRATIVE PURPOSES FOR THE

8   PROPOSITION THAT MY CLIENT HAD IT IN HIS POSSESSION AND HE

9   RECOGNIZES IT; BUT IF THE SUBSTANCE IS GOING TO BE INTRODUCED,

10   THEN I THINK THAT THE HEARSAY AND AUTHENTICATION OBJECTIONS

11   STAND.  SIMILARLY, I DON'T THINK THAT THE AGENT COULD TESTIFY

12   THAT HE REVIEWED ALL THE SPANISH LANGUAGE CONTENTS ON THE CARD

13   AND THAT TODAY IT'S THE SAME CONTENTS THAT IT WAS WHEN HE

14   REVIEWED IT PREVIOUSLY IF HE'S NOT ABLE TO READ SPANISH.

10:59:46  15          THE COURT:  MR. BENJAMIN, YOUR RESPONSE?

16          MR. BENJAMIN:  YES, YOUR HONOR.  SO THIS IS NOT

17   HEARSAY.  IT'S NOT BEING ADMITTED FOR THE DETAILS, THE DETAILED

18   INFORMATION THAT'S ON THE CARD.  THE MAIN THING IT'S BEING

19   ADMITTED FOR IS THE FACT THAT THE AGENT ASKED THE DEFENDANT FOR

20   A FORM OF IDENTIFICATION, AND THIS WAS THE FORM OF

21   IDENTIFICATION THE DEFENDANT GAVE HIM.  IT'S ACTUALLY PRIMARILY

22   RELEVANT, AS MR. STITT IDENTIFIED, BECAUSE IT DID NOT APPEAR TO

23   BE A UNITED STATES FORM OF IDENTIFICATION.  SO IT'S NOT BEING

24   ADMITTED TO PROVE ANY OF THE, ESSENTIALLY, ANYTHING IN THE

25   MIDDLE TO BOTTOM HALF OF THE CARD.  IT'S SOUGHT TO BE ADMITTED

11:00:23  1  AS EVIDENCE THAT THE ONLY FORM OF IDENTIFICATION THAT HE

2  PROVIDED THE AGENT WAS A NON-UNITED STATES FORM OF

3  IDENTIFICATION WHICH IS RELEVANT TO ALIENAGE.

4      THE COURT:  SO MR. STITT, IF I ADMIT IT FOR THE

5  LIMITED PURPOSE OF SHOWING NOT THAT, THAT ANY OF THE CONTENTS

6  IN EXHIBIT 2 ARE TRUE BUT THAT IT WAS THE FORM OF I.D. THAT WAS

7  PRESENTED BY DEFENDANT ON REQUEST, WOULD YOU MAINTAIN YOUR

8  OBJECTION?

9      MR. STITT:  I WOULD.  INSTEAD, I WOULD SUGGEST THAT

10  THE ONLY PURPOSE THAT THE GOVERNMENT SEEKS TO USE THIS FOR IS

11  TO MERELY ASK THE AGENT THAT WHEN YOU ASKED MR. LAZCANO FOR

12  IDENTIFICATION, DID HE PRODUCE ANY UNITED STATES

13  GOVERNMENT-ISSUED IDENTIFICATION DOCUMENTS TO YOU?  THE ANSWER,

14  I UNDERSTAND, WOULD BE NO.  AND THEN HE OBVIATED THE HEARSAY

11:01:15  15  AUTHENTICATION ISSUES WITH RESPECT TO THIS CARD AND THE

16  GOVERNMENT HAS THE PROOF THAT IT'S SEEKING TO USE THIS FOR.

17      THE COURT:  THAT'S VERY HELPFUL.  I LIKE THE SPIRIT

18  OF COOPERATION.  THAT IS ANOTHER REASONABLE WAY TO GO ABOUT IT.

19  MR. BENJAMIN, DO YOU WANT TO TRY IT THAT WAY?

20      MR. BENJAMIN:  YOU HONOR, IT WOULD STILL BE THE

21  GOVERNMENT'S POSITION THAT THIS IS NOT HEARSAY BECAUSE

22  ESSENTIALLY THE ONLY THING IT'S BEING INTRODUCED TO DECLARE IS

23  THAT IT IS THE DEFENDANT'S IDENTIFICATION AND THAT'S AN ADOPTED

24  ADMISSION BY THE DEFENDANT AND HE PRESENTED IT.

25      MR. STITT:  THAT'S A COMPLETELY DIFFERENT PURPOSE

| | |
|---|---|
| 11:01:48 | 1 |

1  THAN WHAT MR. BENJAMIN INITIALLY STATED HE WAS INTRODUCING IT

2  FOR.   THAT IS MY CONCERN AND WHY I THINK THAT THE GOVERNMENT

3  WANTS TO INTRODUCE THIS DOCUMENT AND THEN EXTRAPOLATE IN

4  CLOSING THAT HE IS A MEXICAN CITIZEN, AND THIS IS PROOF OF HIS

5  MEXICAN CITIZENSHIP, WHICH I THINK IN ORDER TO TIE THAT LINK UP

6  THEY NEED THE CONTENTS OF THE CARD WHICH THEY HAVE NOT

7  AUTHENTICATED WHICH IS WRITTEN.   IT'S A WRITTEN DOCUMENT.   IT'S

8  HEARSAY.   IT'S A STATEMENT.   AND THEY'RE ALSO ASKING SOMEONE

9  WHO I DON'T THINK READS SPANISH TO SAY, I READ THIS DOCUMENT IN

10  A LANGUAGE I DON'T READ A FEW WEEKS AGO, AND THEN TODAY I CAN

11  TELL YOU IN A LANGUAGE I CAN'T READ THAT IT'S THE SAME CONTENT.

12  I JUST DON'T SEE HOW THAT POSSIBLY CAN BE ADMITTED ON THAT

13  BASIS.

14           THE COURT:   WELL, I THINK THE WAY I SEE IT IS I TAKE

11:02:36  15  IT AS EVIDENCE THAT WHEN ASKED FOR IDENTIFICATION THIS IS WHAT

16  WAS PRODUCED.   WHETHER THE IDENTIFICATION IS VALID OR NOT IS

17  NOT SOMETHING THE COURT -- I CERTAINLY CAN'T TAKE JUDICIAL

18  NOTICE OF THAT, AND I CERTAINLY CAN'T LOOK TO EXHIBIT 2 AS

19  PROOF THAT THIS IS VALID IDENTIFICATION.   THE ONLY WAY I WOULD

20  BE ABLE TO ADMIT IT INTO EVIDENCE IS TO SEE IT AS THIS IS WHAT

21  WAS GIVEN TO AGENT COURTNEY WHEN A REQUEST FOR I.D. WAS MADE.

22           MR. BENJAMIN:   YES, YOUR HONOR.   THAT IS WHAT WE'RE

23  SEEKING TO ADMIT, THAT HE -- HE ESSENTIALLY REPRESENTED THAT

24  THIS THIS IS HIS I.D. AND IT'S APPARENT FROM ITS FACE THAT THIS

25  IS NOT A UNITED STATES FORM OF I.D.

11:03:12  1        THE COURT:  WELL, I DON'T KNOW THAT I CAN ASSUME

2  ANYTHING BASED ON ACTUALLY LOOKING AT THE I.D. ABOUT WHAT IT

3  MEANS BECAUSE I THINK THAT'S WHERE YOU GET INTO PROBLEMS ABOUT

4  WHETHER IT IS AN AUTHENTIC MEXICAN I.D.  I DON'T KNOW.  HE

5  ASKED FOR I.D.  HE CERTAINLY DIDN'T PRODUCE A UNITED STATES

6  I.D.

7        MR. BENJAMIN:  YES, YOUR HONOR.  TO CLARIFY WHAT I'M

8  SAYING, THE COURT CAN LOOK AT THE I.D. AND SEE IT DOES NOT HAVE

9  THE SEAL OF THE UNITED STATES ON IT OR THE SEAL OF ANY STATE OF

10  THE UNITED STATES ON IT.  NOT THAT IF IT'S A VALID MEXICAN

11  I.D., JUST THAT IT DOES NOT APPEAR TO BE A VALID UNITED STATES

12  I.D.

13        THE COURT:  SO I WILL ADMIT EXHIBIT 2 FOR THE LIMITED

14  PURPOSE OF DEMONSTRATING THAT THIS IS THE IDENTIFICATION, A

11:03:48  15  COPY OF THE IDENTIFICATION THAT WAS PROVIDED BY THE DEFENDANT

16  WHEN IDENTIFICATION WAS REQUESTED.

17        MR. BENJAMIN:  THANK YOU, YOUR HONOR.  TO CLARIFY,

18  THE UNITED STATES IS SEEKING TO ADMIT THE ACTUAL CARD NOT THE

19  PICTURE OF IT.  THAT WAS JUST PROVIDED FOR THE CONVENIENCE TO

20  THE COURT.

21        MR. STITT:  I WOULD OBJECT TO THAT.  I'M FINE WITH

22  THE COPY AND THE ACTUAL CARD WILL GO BACK TO THE MEXICAN

23  CONSULATE AND BE RETURNED TO MY CLIENT AFTER THE CASE.

24        MR. BENJAMIN:  AS LONG AS THERE'S NO BEST EVIDENCE

25  OBJECTION.

11:04:11   1            MR. STITT:  NO BEST EVIDENCE OBJECTION.

        2            THE COURT:  YES, THAT'S A BETTER WAY TO PROCEED.  AND

        3    THAT'S HOW I ASSUMED WE WERE GOING, SO...

        4            MR. BENJAMIN:  I JUST WANT TO MAKE SURE THERE WAS NO

        5    OBJECTION TO USING THE COPY SINCE WE HAVE THE ACTUAL DOCUMENT.

        6            THE COURT:  THAT'S FINE.  MY UNDERSTANDING IS THAT

        7    THE DEFENSE HAS NO OBJECTION TO THE COPY OF THE I.D. BEING

        8    ADMITTED AS OPPOSED TO THE I.D. ITSELF.

        9            MR. STITT:  ABSOLUTELY.

       10            THE COURT:  OKAY.

       11            (EXHIBIT 2 ADMITTED.)

       12    BY MR. BENJAMIN:

       13    Q.  AGENT COURTNEY, WHEN YOU ASKED THE DEFENDANT FOR I.D., WAS

       14    THIS THE ONLY I.D. HE GAVE YOU, OR DID HE ALSO GIVE YOU ANY

11:04:42  15    UNITED STATES I.D.?

       16    A.  THIS IS THE ONLY I.D. HE GAVE ME.

       17    Q.  DID HE PROVIDE YOU WITH A UNITED STATES PASSPORT CARD OR

       18    UNITED STATES PASSPORT BOOK OR ANYTHING ISSUED BY THE UNITED

       19    STATES?

       20    A.  NO, HE DID NOT.

       21    Q.  WHAT HAPPENED AT THIS POINT?

       22    A.  AT THIS POINT, I COLLECTED IDENTIFICATIONS FROM ALL NINE

       23    SUBJECTS.  I WROTE DOWN THEIR NAMES ON A, WHAT WE CALL A

       24    DETENTION SHEET.  AT THAT TIME AGENT TAM, OUR BORDER PATROL

       25    EMT, ARRIVED.  I SPOKE TO HIM ABOUT THE SUBJECT, THE DEFENDANT

11:05:21  1   OVER HERE, ABOUT HIS INJURIES AND THAT I NEEDED TO MAKE SURE

2   THAT WHETHER HE NEEDS FURTHER MEDICAL ATTENTION TO GO TO THE

3   HOSPITAL OR ANYTHING.  AT THAT TIME, AGENT TAM ASSESSED HIS

4   INJURIES.  HE BEGAN CLEANING HIM AND APPLYING BANDAGES WHICH I

5   ASSISTED WITH APPLYING BANDAGES TO HIS WOUNDS.  AGENT TAM SAID,

6   LOOKING AT THE WOUNDS, THAT NO FURTHER MEDICAL -- THAT HE

7   DIDN'T NEED ANY MORE MEDICAL ASSISTANCE AFTER THAT, THAT HE

8   DIDN'T NEED TO GO SEE A DOCTOR OR GO TO THE HOSPITAL OR

9   ANYTHING.  AT THAT TIME, WE SAT HIM BACK DOWN.  I THEN

10   QUESTIONED ALL THE SUBJECTS.  I ASKED THEM WHERE THEY WERE BORN

11   IN THE SPANISH LANGUAGE...(WHEREUPON, THE WITNESS IS SPEAKING

12   SPANISH)...WHICH EVERYONE SAID MEXICO.

13   Q.  AS TO THAT QUESTION, DID YOU SPECIFICALLY HEAR THE

14   DEFENDANT RESPOND TO THAT QUESTION?  DO YOU ASK THE QUESTION TO

11:06:33  15   ALL OF THEM AND LOOK --

16   A.  I ASK TO EVERYONE AND THEN I LOOK TO EACH PERSON TO

17   RESPOND.  IF SOME PEOPLE DO NOT RESPOND THEN I

18   SAY...(WHEREUPON, THE WITNESS IS SPEAKING SPANISH)...LIKE,

19   EVERYONE, AND I MAKE SURE THAT EVERYONE RESPONDS TO MY

20   QUESTION.

21   Q.  SO WHAT WAS THE DEFENDANT'S RESPONSE TO THAT QUESTION?

22   A.  MEXICO.

23   Q.  WHAT WAS THE NEXT QUESTION AFTER THAT?

24   A.  THE NEXT QUESTION I ASK IS WHETHER THEY WERE IN THE UNITED

25   STATES ILLEGALLY.

34

11:06:54  1  Q.  WHAT WAS SPECIFICALLY --

2  A.  IN THE SPANISH LANGUAGE.  YES.

3  Q.  WHAT HAPPENED NEXT?  WHAT DID YOU ASK HIM?

4  A.  AFTER I ESTABLISHED THAT THEY WERE ALL PRESENT ILLEGALLY,

5  AT THAT TIME, THE BORDER PATROL TRANSPORT AGENT ARRIVED, AND HE

6  THEN PROCEEDED TO PICK ALL OF THE SUBJECTS UP.

7  Q.  I WANT TO TALK TO YOU ABOUT THE CONVERSATION YOU'RE HAVING

8  WITH THE DEFENDANT.  WHAT SORT OF TONE WERE YOU TALKING TO HIM

9  IN?

10  A.  I GUESS A NORMAL TONE, LOUD ENOUGH FOR EVERYONE TO HEAR ME

11  BECAUSE IT WAS NINE SUBJECTS THAT WERE KIND OF SPREAD OUT ON

12  THE HILL.

13  Q.  ALL RIGHT.  WERE YOU ACTING AGGRESSIVELY TOWARD THEM IN ANY

14  WAY?

11:07:41  15  A.  NO, I WAS NOT.

16  Q.  DID YOU HAVE ANY WEAPON DRAWN AT THAT POINT?

17  A.  NO, I DID NOT.

18  Q.  DID YOU THREATEN THE DEFENDANT IN ANY WAY?

19  A.  NO, I DID NOT.

20  Q.  DID YOU ISSUE -- AT THE TIME WHEN YOU WERE TALKING TO THE

21  DEFENDANT, WAS HE HANDCUFFED?

22  A.  NO, HE WAS NOT.

23  Q.  AND HAD HE BEEN HANDCUFFED AT ANY POINT LEADING UP TO THAT

24  POINT?

25  A.  NO, HE WAS NOT.

11:08:01  1  Q.  AND APPROXIMATELY HOW LONG DID ALL OF THIS TAKE FROM

2  GETTING HIM BACK TO THE GROUP TO YOU QUESTIONING HIM?

3  A.  MAYBE APPROXIMATELY 10 TO 20 MINUTES.

4  Q.  OKAY.  AND WHAT WAS HAPPENING, IN BROAD STROKES, BETWEEN

5  THAT 10 TO 20 MINUTES?  WHAT WERE YOU DOING?

6  A.  I WAS BUSY STILL COORDINATING WITH THE EMT TO OUR LOCATION.

7  I WAS ALSO CONTACTING HIM VIA CELL PHONE TO TRY TO EXPLAIN THE

8  SITUATION AND MAKE SURE WHETHER I NEED TO CALL A PARAMEDIC.  I

9  MEAN, IF PARAMEDICS WERE NECESSARY FOR HIS INJURIES, I WOULD

10  HAVE TO CALL AHEAD OF TIME, AND IT WOULD TAKE A LOT OF

11  COORDINATION TO GET THE PARAMEDICS OUT THERE.  SO I WANTED TO

12  MAKE SURE IT WASN'T NECESSARY AT THE TIME.

13  Q.  SO YOU HANDLED ALL OF THE IMMEDIATE MEDICAL ATTENTION

14  BEFORE GOING INTO THE IMMIGRATION INSPECTION?

11:09:03 15  A.  YES.

16  Q.  THANK YOU.  NOTHING FURTHER, YOUR HONOR.

17          THE COURT:  ALL RIGHT.  CROSS-EXAMINATION?

18          MR. STITT:  YES, YOUR HONOR.

19                    CROSS-EXAMINATION

20  BY MR. STITT:

21  Q.  AGENT COURTNEY, I'M GOING TO STAND UP HERE OUT OF HABIT.

22  SO LET ME KNOW IF YOU CAN'T HEAR ME FROM THE MICROPHONE; OKAY?

23  SO I'D LIKE TO TALK WITH YOU GENERALLY ABOUT THE AREA IN WHICH

24  YOU MADE THE ARREST.  THIS IS GOVERNMENT'S EXHIBIT 1, AND THIS

25  IS THE GENERAL AREA, RIGHT?

11:09:35  1    A.  THAT IS A BLOWN-UP AREA OF THE CHULA VISTA AREA OF

         2    OPERATIONS.

         3    Q.  RIGHT.  SO IT SAYS HERE IN THE SORT OF CENTER TO THE LEFT

         4    WHERE I HAVE MY PEN -- CAN YOU SEE THAT?

         5    A.  YES.

         6    Q.  THAT'S THE OTAY MESA PORT OF ENTRY, RIGHT?

         7    A.  YES.

         8    Q.  AND THE OTAY MESA PORT OF ENTRY HAS A COMMERCIAL PORT OF

         9    ENTRY, RIGHT?

        10    A.  YES, IT DOES --

        11    Q.  AND PEDESTRIAN PORT OF ENTRY?

        12    A.  YES, IT DOES.

        13    Q.  AND THEN ALSO AN ENTRY FOR JUST REGULAR CAR TRAFFIC AS

        14    WELL?

11:10:08 15    A.  REGULAR CAR TRAFFIC?  YES, IT DOES.

        16    Q.  SO IS IT FAIR TO CHARACTERIZE THE OTAY MESA PORT OF ENTRY

        17    AS A BUSY PORT OF ENTRY?

        18    A.  YES, IT IS.

        19    Q.  AND SO MANY, MANY, IF NOT THOUSANDS AND THOUSANDS, OF

        20    PEOPLE ARE CROSSING THE BORDER THROUGH THE OTAY MESA PORT OF

        21    ENTRY ON A DAILY BASIS?

        22    A.  YES, THEY ARE.

        23    Q.  AND ADJACENT TO THE OTAY MESA PORT OF ENTRY ON BOTH THE

        24    UNITED STATES AND THE MEXICAN SIDE, THERE ARE A LOT OF

        25    WAREHOUSES, RIGHT?

11:10:44   1   A.   YOU'RE SAYING NORTH AND SOUTH OR EAST TO WEST?

2   Q.   NORTH AND SOUTH, LIKE ACROSS THE BORDER, THERE ARE

3   WAREHOUSES ON EITHER SIDE RIGHT ADJACENT TO THE PORT OF

4   ENTRY?

5   A.   YES, THERE IS.

6   Q.   ESPECIALLY ON THE UNITED STATES SIDE, IT'S LARGELY

7   COMMERCIAL BUSINESSES IN THE AREA?

8   A.   AT THE OTAY MESA PORT OF ENTRY, YES.

9   Q.   AND THERE ALSO IS A FAIRLY LARGE BORDER PATROL OFFICE

10   THAT'S JUST WEST OF THE OTAY MESA PORT OF ENTRY; CORRECT?

11   A.   YES, APPROXIMATELY I THINK TWO MILES AWAY FROM IT.

12   Q.   AND WE CAN SEE ALSO, GENERALLY, IN THIS, YOU KNOW, BLOWN-UP

13   MAP, THAT THIS IS A FAIRLY INDUSTRIAL AND POPULATED AREA IN THE

14   AREA NEAR THE OTAY MESA PORT OF ENTRY; IS THAT RIGHT?

11:11:33   15   A.   INDUSTRIAL, YES.

16   Q.   AND THERE ARE IN FACT TWO JAILS IN THE AREA?

17   A.   TWO JAILS PLUS A JUVENILE DETENTION CENTER.

18   Q.   THAT'S RIGHT.  AND HIGHWAY 94 WHICH WE SEE IN THE UPPER

19   RIGHT-HAND CORNER OF THE MAP IS A MAJOR EAST-WEST ROAD THAT'S

20   NORTH OF THE UNITED STATES BORDER BUT SOUTH OF THE I-8

21   INTERSTATE?  SO HIGHWAY 94 RUNS PARALLEL TO THE BORDER LARGELY

22   BUT SOUTH OF WHERE THE I-8 INTERSTATE IS?

23   A.   YES, IT IS.

24   Q.   YOU MENTIONED THAT DURING THE DAY, THE AREA WHERE YOU, THE

25   GENERAL AREA WHERE YOU ARRESTED THIS GROUP IS FREQUENTED BY

11:12:29   1   UNITED STATES CITIZENS; CORRECT?

2   A.   DURING THE DAYTIME?

3   Q.   DURING THE DAYTIME, THAT'S WHAT YOU TESTIFIED TO, RIGHT?

4   A.   NO.   WHEN I APPREHENDED THEM, IT WAS DURING NIGHTTIME.

5   Q.   I UNDERSTAND.   BUT WE'RE TALKING GENERALLY.   SO GENERALLY,

6   DURING THE DAYTIME, YOU WOULD AGREE THAT THIS AREA IS GENERALLY

7   FREQUENTED BY AMERICAN CITIZENS IN YOUR EXPERIENCE?

8   A.   YES, I DO SEE AMERICAN CITIZENS DRIVING UP AND DOWN THE

9   TRUCK TRAIL.

10   Q.   AND IF SOMEONE WERE TO ENTER THE UNITED STATES THROUGH THE

11   OTAY MESA PORT OF ENTRY, EITHER THROUGH THE COMMERCIAL PORT,

12   CAR PORT OR THE PEDESTRIAN PORT, AND THEN SEEK TO AVOID CONTACT

13   WITH CIVILIZATION, THEY WOULD HIKE AND WALK TO THE NORTHWEST TO

14   THIS REMOTE AREA; CORRECT?

11:13:37   15             MR. BENJAMIN:   OBJECTION.   CALLS FOR SPECULATION.

16             THE COURT:   OVERRULED.

17             THE WITNESS:   IF THEY WERE TRYING TO GO AROUND, AWAY

18   FROM CIVILIZATION, IS THAT WHAT YOU'RE SAYING?

19   BY MR. STITT:

20   Q.   YEAH.

21   A.   I MEAN, TO WALK FROM THE OTAY MESA PORT OF ENTRY ALL THE

22   WAY TO WHERE THE SUBJECT WAS, I MEAN, THAT WOULD TAKE AT LEAST

23   HALF THE DAY OF WALKING.   IT'S A VERY DENSE AREA.

24   Q.   THEORETICALLY, IF SOMEONE ENTERED IN THE DAY THROUGH THE

25   OTAY MESA PORT OF ENTRY AND GOT LOST HIKING, THEY COULD

11:14:16  1  CONCEIVABLY BE AT THE HIGH POINT WHERE YOU FOUND THEM, RIGHT?

2  A.  I GUESS IT'S A POSSIBILITY; SOMETHING I'VE NEVER SEEN BUT A

3  POSSIBILITY.

4  Q.  OKAY.  WHEN YOU -- I'D LIKE TO TRANSITION NOW TO THE

5  ARREST.  AND SO AS YOU'RE APPROACHING THE GROUP INITIALLY, YOUR

6  INTENTION WAS TO ARREST THE PEOPLE IN THE GROUP, RIGHT, AND TO

7  DETAIN THEM?

8  A.  MY INITIAL WAS TO DETAIN THEM, YES.

9  Q.  AND YOU WERE ABLE TO DETAIN MOST OF THEM AND THEN TWO

10  PEOPLE RAN; CORRECT?

11  A.  TWO PEOPLE RAN BEFORE I DETAINED ANYONE.

12  Q.  RIGHT.  AND THEN AFTER DETAINING, I GUESS, MOST OF THE

13  GROUP, YOU WENT AND DETAINED MR. LAZCANO AFTER HE FELL?

14  A.  YES, I DID.

11:15:12  15  Q.  AND WHEN YOU ENCOUNTERED MR. LAZCANO AFTER HE FELL, HE'S

16  CLEARLY NOT FREE TO LEAVE, RIGHT?

17  A.  NO, HE'S NOT.

18  Q.  AND YOU WALKED WITH HIM BACK TO WHERE THE GROUP, WHERE YOU

19  ORIGINALLY ENCOUNTERED THE GROUP, RIGHT?

20  A.  YES.

21  Q.  HE'S NOT FREE TO LEAVE AT THAT POINT?

22  A.  NO, HE'S NOT.

23  Q.  AND THEN YOU WALKED WITH HIM AND TOOK HIM TO THE TRUCK ROAD

24  TO WAIT FOR THE EMT, RIGHT?

25  A.  YES, I DID.

11:15:42   1   Q.  HE'S NOT FREE TO LEAVE AT THIS POINT?

        2   A.  NO, HE IS NOT.

        3   Q.  AND ABOUT HOW LONG WAS IT, TIMEWISE, BETWEEN WHEN YOU FIRST

        4   ENCOUNTERED THE GROUP AND THE TWO PEOPLE RAN TO WHEN YOU

        5   BROUGHT MR. LAZCANO BACK UP TO THE TRUCK TRAIL AND THE EMT

        6   ARRIVED?

        7   A.  COULD BE TEN TO 20 MINUTES.

        8   Q.  OKAY.  COULD IT HAVE BEEN LONGER?  IT SORT OF SEEMS LIKE A

        9   LOT HAPPENED SO...

     10   A.  WELL, A LOT DOES HAPPEN, BUT A LOT HAPPENED IN A VERY SHORT

     11   AMOUNT OF TIME.  I WOULD THINK IT WOULD BE -- I MEAN, IT COULD

     12   BE POSSIBLE IT TOOK UP TO 25 MINUTES.  I DON'T KNOW.  BUT FROM

     13   WHAT I REMEMBER, IT WAS AROUND 10 TO 20 MINUTES.

     14   Q.  ALL RIGHT.  AND AFTER MR. LAZCANO WAS BANDAGED AND HE WAS

11:16:48 15   TREATED, HE OBVIOUSLY WAS NOT FREE TO LEAVE AT THAT POINT?

     16   A.  HE WAS NOT?

     17   Q.  FREE TO LEAVE AT THAT POINT?

     18   A.  NO, HE WAS NOT.

     19   Q.  I IMAGINE AT THIS POINT YOU HAD ALREADY CALLED FOR AGENTS

     20   TO COME WITH A VEHICLE TO TRANSPORT ALL THE PEOPLE YOU

     21   ARRESTED, RIGHT?

     22   A.  YES, I DID CALL THEM AHEAD OF TIME.

     23   Q.  AND THEY NEEDED TO BRING A TRUCK OR CAR BIG ENOUGH FOR

     24   EVERYONE SO EVERYONE COULD FIT?

     25   A.  YES.

| | |
|---|---|
| 11:17:15 | 1 |

Q.  THEY WERE ON THEIR WAY BEFORE, YOU KNOW, MR. LAZCANO

2  RECEIVED TREATMENT FROM THE EMT?

3  A.  I COULD NOT SAY WHETHER THEY WERE ON THEIR WAY OR NOT.

4  Q.  BUT YOU CONTACTED THEM TO REQUEST THEIR PRESENCE BEFORE MR.

5  LAZCANO RECEIVED TREATMENT BY THE EMT?

6  A.  YES, I DID.

7  Q.  SO WHEN YOU FINISHED GIVING MR. LAZCANO THE MEDICAL

8  TREATMENT THAT HE NEEDED, THAT'S WHEN YOU ASKED THE GROUP THESE

9  IMMIGRATION QUESTIONS, RIGHT?

10  A.  YES, I DID.

11  Q.  AND BY THE TIME YOU HAD ASKED MR. LAZCANO THE IMMIGRATION

12  QUESTIONS, STARTED TO ASK THE IMMIGRATION QUESTIONS, MR.

13  LAZCANO IS UNDER ARREST IN YOUR VIEW, RIGHT?

14            MR. BENJAMIN:  OBJECTION.  CALLS FOR LEGAL

11:18:01  15  CONCLUSION.

16            THE COURT:  SUSTAINED.

17  BY MR. STITT:

18  Q.  WHEN MR. LAZCANO IS FINISHED GETTING TREATMENT FROM THE EMT

19  AND BEFORE YOU ASK HIM ANY IMMIGRATION-RELATED QUESTIONS, HE

20  WAS NOT FREE TO LEAVE; CORRECT?

21  A.  NO, HE WAS NOT.

22  Q.  IF HE HAD STOOD UP AND TRIED TO WALK DOWN THE ROAD NORTH OR

23  SOUTH, EAST OR WEST, YOU WERE GOING TO DETAIN HIM, RIGHT?

24  A.  I WOULD HAVE STOPPED HIM, YES.

25  Q.  AND SO YOU ASKED HIM IF HE WAS BORN IN MEXICO; CORRECT?

11:18:36   1    A.  NO, I DID NOT.  I ASKED HIM WHERE HE WAS BORN, AND HE

2    RESPONDED MEXICO.

3    Q.  THANK YOU FOR THAT.  AND SO YOU RECEIVED SOME IMMIGRATION

4    TRAINING, I BELIEVE, AT THE ACADEMY, RIGHT?

5    A.  YES, I DID.

6    Q.  DID YOU LEARN AS PART OF YOUR IMMIGRATION TRAINING THAT

7    PEOPLE BORN OUT OF THE UNITED STATES CAN STILL RECEIVE

8    CITIZENSHIP FROM THE UNITED STATES?

9    A.  YES, THEY CAN.

10   Q.  SO AFTER ASKING THE GROUP WHERE THEY WERE BORN, YOUR NEXT

11   QUESTION WAS WHETHER THEY WERE PRESENT IN THE UNITED STATES

12   ILLEGALLY, RIGHT?

13   A.  YES, IT WAS, OR IF THEY WERE IN THE UNITED STATES

14   ILLEGALLY.

11:19:20  15   Q.  OKAY.  AND MR. LAZCANO RESPONDED THAT HE WAS?

16   A.  YES, HE DID.

17   Q.  AND YOU DID NOT ASK MR. LAZCANO HOW HE LAST ENTERED THE

18   UNITED STATES; CORRECT?

19   A.  WE DID ASK HIM -- WE ASKED THE GROUP WHERE THEY ENTERED THE

20   UNITED STATES.

21   Q.  OKAY.  THAT WAS NOT ONE OF THE LIST OF QUESTIONS THAT YOU

22   INCLUDED WHEN MR. BENJAMIN ASKED YOU --

23   A.  NO, THAT WAS ONLY FOR FILLING OUT OUR DETENTION SHEET TO

24   IDENTIFY WHERE EXACTLY THEY DO ENTER.  BUT NO, IT WAS NOT

25   LISTED FOR, ON MY REPORT.

11:19:59   1   Q.   OKAY.   SINCE ARRESTING MR. LAZCANO JUST A FEW WEEKS AGO,

2   YOU HAVEN'T BEEN INVOLVED IN INVESTIGATING HIS CITIZENSHIP OR

3   FOLLOWING UP ON HIS CASE IN ANY WAY; IS THAT RIGHT?

4   A.   NO, OTHER THAN JUST READING MY REPORT.

5   Q.   OKAY.   I HAVE NO FURTHER QUESTIONS.   THANK YOU.

6            THE COURT:   ANY REDIRECT?

7            MR. BENJAMIN:   BRIEFLY, YOUR HONOR.

8                        REDIRECT EXAMINATION

9   BY MR. BENJAMIN:

10   Q.   NOW YOU SPOKE WITH MR. STITT ABOUT SEEING UNITED STATES

11   CITIZENS ON THE TRUCK TRAIL WHICH -- DO YOU FREQUENTLY

12   ENCOUNTER UNITED STATES OFF IN THE BRUSH WHERE YOU FOUND THE

13   DEFENDANT?

14   A.   NEVER.

11:20:51   15   Q.   YOU ALSO SPOKE ABOUT GOING FROM OTAY MESA TO THIS AREA.   IN

16   YOUR EXPERIENCE AS A BORDER PATROL AGENT AND YOUR TESTIMONY OF

17   TALKING TO THOUSANDS OF ALIENS, HAS ANY ALIEN EVER TOLD YOU

18   THAT THEY WALK FROM THE OTAY MESA PORT OF ENTRY TO THIS AREA?

19            MR. STITT:   OBJECTION.   RELEVANCE.

20            THE COURT:   I'LL ALLOW IT.   OVERRULED.

21            THE WITNESS:   NO, THEY HAVE NOT.

22   BY MR. BENJAMIN:

23   Q.   MR. STITT JUST ASKED YOU WHETHER THEY TOLD YOU WHERE THEY

24   ENTERED FROM, AND YOU SAID YES.   WHERE DID THEY SAY THEY

25   ENTERED FROM, THIS GROUP?

11:21:26   1   A.   THE GROUP, WHERE THEY SAID THEY ENTERED FROM?

2   Q.   YES.

3   A.   FROM WHAT AGENTS IDENTIFY AS WHITE CROSS, BUT IT'S DIRECTLY

4   SOUTH FROM THAT AREA ABOUT A MILE.

5   Q.   THANK YOU.  NOTHING FURTHER, YOUR HONOR.

6           THE COURT:  ANY RECROSS?

7           MR. STITT:  YES, YOUR HONOR.

8                   RECROSS-EXAMINATION

9   BY MR. STITT:

10   Q.   AGENT COURTNEY, YOU MENTIONED THAT YOU ASKED THEM WHERE

11   THEY ENTER AND THEIR RESPONSE WAS WHITE CROSS; CORRECT?

12   A.   YES.

13   Q.   AND THAT WAS REPORTED IN YOUR APPREHENSION REPORT?

14   A.   IT WAS NOT RECORDED IN MY REPORT.

11:22:10  15   Q.   APPREHENSION REPORT, THE HANDWRITTEN REPORT?

16   A.   THE DETENTION SHEET THAT WE FILL OUT?

17   Q.   THANK YOU.

18   A.   I WOULD NEED TO SEE THE DETENTION SHEET.

19   Q.   SO TELL ME ABOUT THE DETENTION SHEET.  THIS IS A FORM THAT

20   YOU REGULARLY FILL OUT WHEN YOU APPREHEND PEOPLE; IS THAT

21   RIGHT?

22   A.   IT'S A FORM THAT WE FILL OUT FOR WHEN WE ARE DETAINING

23   PEOPLE AT THE TIME.

24   Q.   AND YOU FILLED THIS FORM OUT ON THE SIDE OF THE TRUCK ROAD

25   WHILE YOU WERE WITH THE EMT OR AFTER?

```
11:22:45   1    A.   I FILLED THIS OUT PRIOR TO THE EMT ARRIVING AND THEN WHILE

           2    THE EMT WAS SPEAKING TO MR. LAZCANO.

           3    Q.   AND IN YOUR DETENTION REPORT, IT'S JUST A HANDWRITTEN

           4    REPORT WITH SOME INFORMATION INCLUDING WHERE THE GROUP

           5    ENTERED?

           6    A.   YES.   IT INCLUDES THE ENTRY LOCATION WHICH IS WE PUT DOWN

           7    WHAT ZONE THEY ENTER.

           8    Q.   OKAY.   YOUR HONOR, I WOULD MOVE UNDER JENCKS TO EXCLUDE THE

           9    WITNESS'S TESTIMONY.   I HAVEN'T RECEIVED THIS REPORT, AND

          10    SIMILARLY, I HAVEN'T RECEIVED IT UNDER RULE 16.   UNLESS THE

          11    GOVERNMENT HAS THE PAGE...

          12              MR. BENJAMIN:   LET ME SEE IF I HAVE IT HERE WITH ME.

          13              THE COURT:   IN PARTICULAR, YOU WANT TO EXCLUDE THE

          14    TESTIMONY ABOUT WHERE THE GROUP TOLD HIM THAT THEY ENTERED

11:23:38  15    FROM?

          16              MR. STITT:   NO, YOUR HONOR.   THE JENCKS RULE REQUIRES

          17    UPON REQUEST --

          18              THE COURT:   I KNOW THAT.   BUT WHAT'S THE SPECIFIC --

          19    ARE YOU TRYING TO EXCLUDE ALL HIS TESTIMONY OR WHAT TESTIMONY

          20    DO YOU WANT TO EXCLUDE UNDER THE JENCKS RULE?

          21              MR. STITT:   JENCKS WOULD EXCLUDE HIS TESTIMONY IN ITS

          22    ENTIRETY.

          23              MR. BENJAMIN:   I APOLOGIZE, YOUR HONOR.   I'M LOOKING

          24    UP OUR ELECTRONIC DISCOVERY.   SORRY.   I'M HAVING A PROBLEM

          25    PULLING IT UP ON MY PHONE.   IF WE CAN HAVE A BRIEF RECESS?
```

11:25:12  1           THE COURT:  LET ME MAKE SURE.  I THINK -- DON'T YOU

2  NEED TO MOVE FIRST FOR A COPY OF ANY STATEMENT?

3           MR. STITT:  I THINK YOU'RE RIGHT.  AND I WILL MOVE

4  FOR A COPY OF THE STATEMENT NOW, AND THEN THE RULE SAYS --

5           THE COURT:  BUT DIDN'T HE JUST TESTIFY THAT HE DIDN'T

6  PUT THIS IN HIS STATEMENT?  SO THAT'S WHY I DON'T KNOW THAT WE

7  SHOULD EXCLUDE EVERYTHING THAT HE JUST TOLD US BUT MAYBE

8  EXCLUDE THE PART THAT HE ACKNOWLEDGED IS NOT ACTUALLY INCLUDED

9  IN THE WRITTEN STATEMENT.

10          MR. STITT:  HE INCLUDED, I BELIEVE, AND AGENT

11  COURTNEY CERTAINLY CAN CLARIFY THIS FOR US, BUT I BELIEVE HIS

12  TESTIMONY IS THAT THERE ARE TWO REPORTS.  ONE IS A HANDWRITTEN

13  DETENTION REPORT AND THE OTHER IS A TYPED REPORT FORM G166-C

14  WHICH I HAVE RECEIVED AND COULD SHOW THE COURT.  SO I THINK IF

11:25:52 15  THERE ARE TWO REPORTS, I WOULD MOVE FOR PRODUCTION UNDER

16  JENCKS, AND THEN JENCKS, AT TITLE 18 UNITED STATES CODE SECTION

17  3500(D) SAYS THAT IF THE UNITED STATES DOES NOT COMPLY WITH THE

18  MOTION TO PRODUCE, THEN THE COURT SHALL STRIKE FROM THE RECORD

19  THE TESTIMONY OF THE WITNESS.  SO THAT WOULD BE, THE REMEDY

20  WOULD BE TO STRIKE.  THE GOVERNMENT CAN CERTAINLY PRODUCE IT AT

21  THIS POINT AND THEN, IF IT HAS IT, AND THEN IF THEY DO COMPLY,

22  THEN THE COURT CAN DECIDE WHAT REMEDY TO TAKE BECAUSE IT IS

23  ALSO A RULE 16 VIOLATION AS WELL AS A VIOLATION OF THE COURT'S

24  STANDING DISCOVERY ORDER TO PRODUCE ALL DISCOVERY BY LAST

25  TUESDAY AT 5 P.M.  PERHAPS THE COURT'S INCLINATION TO STRIKE

11:26:43 1   JUST A PORTION OF THE TESTIMONY WOULD BE THE CORRECT REMEDY IF

2   THE GOVERNMENT DOES COMPLY WITH JENCKS.  BUT IF THE GOVERNMENT

3   DOESN'T COMPLY WITH JENCKS, THE STATUTE IS EXPLICIT THAT THE

4   WITNESS'S TESTIMONY IS STRICKEN.

5          MR. BENJAMIN:  YOUR HONOR, MY RECOLLECTION WAS HAVING

6   IT DISCOVERED, BUT I'M TRYING TO FIND IT ON MY PHONE...

7          MR. STITT:  YOU KNOW, I HAVE THE DISCOVERY --

8          THE COURT:  WELL, I'M GOING TO TAKE THIS UNDER

9   SUBMISSION ANYWAY.  SO WE CAN MOVE ON FROM HERE AND I'LL RULE

10   ON THAT SEPARATELY.

11          MR. STITT:  I WOULD ASK THAT HE BE SUBJECT TO RECALL

12   FOR THE CONTINUATION OF CROSS-EXAMINATION BECAUSE I THINK THE

13   PROCEDURE, ALBEIT CONFUSING OR TIME-CONSUMING UNDER JENCKS, IS

14   THAT ONCE THE WITNESS TESTIFIES ON DIRECT EXAMINATION AND THEN

11:27:34 15   THE GOVERNMENT'S OBLIGATION UNDER JENCKS ARE TRIGGERED UPON A

16   MOTION, I'M THEN GIVEN THE DOCUMENT AND ALLOWED TO PREPARE TO

17   FINISH THE CROSS-EXAMINATION WHICH OBVIOUSLY WOULD DELAY THE

18   TRIAL.  SO I WOULD ASK THAT IF THE GOVERNMENT IS GOING TO

19   COMPLY THAT I BE GIVEN A CHANCE TO CONTINUE TO QUESTION AGENT

20   COURTNEY.

21          THE COURT:  THAT'S FINE.  BUT I WANT TO GET THIS DONE

22   TODAY.  SO LET'S SEE WHAT WE CAN DO.  OKAY.  SO MY

23   UNDERSTANDING IS, MR. BENJAMIN, WHAT YOU NEED TO CONFIRM IS

24   THAT THERE WERE TWO REPORTS.  ONE APPEARS TO BE ONE OF THE

25   PROPOSED EXHIBITS, THE MEMORANDUM OF INVESTIGATION, AND THEN

| | | |
|---|---|---|
| 11:28:13 | 1 | THERE'S A SEPARATE REPORT.  I THINK WE CALLED IT -- |
| | 2 | MR. BENJAMIN:  THERE'S A HANDWRITTEN, ESSENTIALLY, |
| | 3 | WORKSHEET THAT I BELIEVE WAS DISCOVERED OVER, BUT I CAN GO BACK |
| | 4 | TO OUR OFFICE AND CHECK. |
| | 5 | THE COURT:  WE'LL BE TAKING A LUNCH BREAK.  SO YOU |
| | 6 | CAN CHECK THAT OVER THE LUNCH BREAK.  WE'LL TAKE THAT UP AS |
| | 7 | SOON AS WE GET BACK FROM LUNCH, OKAY, WHETHER THAT WAS ACTUALLY |
| | 8 | PROVIDED TO THEM BEFORE, AND I'LL LET YOU FIGURE THAT OUT. |
| | 9 | LET'S SEE.  DETENTION SHEET, THAT'S WHAT IT WAS CALLED.  OKAY. |
| | 10 | DO YOU HAVE ANY MORE RECROSS AT THIS MOMENT, MR. STITT? |
| | 11 | MR. STITT:  NO, YOUR HONOR.  I DO NOT. |
| | 12 | THE COURT:  OKAY.  ALL RIGHT.  SO AGENT COURTNEY, |
| | 13 | YOU'RE EXCUSED ONLY TO THE HALL.  YOU DON'T GET TO GO VERY FAR. |
| | 14 | MR. BENJAMIN WILL TALK -- BUT PLEASE WAIT OUT THERE AND DON'T |
| 11:29:02 | 15 | GO ANYWHERE.  WE WILL BE TAKING A BREAK AROUND THE LUNCH HOUR |
| | 16 | AND MR. BENJAMIN CAN FILL YOU IN ON THE NEXT STEPS AT THAT |
| | 17 | TIME.  OKAY? |
| | 18 | THE WITNESS:  YES, YOUR HONOR. |
| | 19 | THE COURT:  THANK YOU.  GOVERNMENT HAVE ANOTHER |
| | 20 | WITNESS? |
| | 21 | MR. BENJAMIN:  YES, YOUR HONOR.  THE GOVERNMENT CALLS |
| | 22 | AGENT CHRISTIAN RIVAS. |
| | 23 | (OATH ADMINISTERED.) |
| | 24 | THE CLERK:  PLEASE STATE YOUR FULL NAME, SIR. |
| | 25 | THE WITNESS:  CHRISTIAN RIVAS. |

11:30:45   1                THE COURT:  PROCEED.

2                           DIRECT EXAMINATION

3    BY MR. BENJAMIN:

4    Q.   THANK YOU, YOUR HONOR.  GOOD MORNING AGENT RIVAS.

5    A.   GOOD MORNING, SIR.

6    Q.   WHAT DO YOU DO FOR A LIVING?

7    A.   I'M A BORDER PATROL AGENT.

8    Q.   HOW LONG HAVE YOU BEEN A BORDER PATROL AGENT?

9    A.   I'VE BEEN A BORDER PATROL AGENT FOR 12 YEARS.

10   Q.   WHAT SORT OF TRAINING DO YOU HAVE THAT QUALIFIES YOU FOR

11   THAT POSITION?

12   A.   SO I ATTENDED THE BORDER PATROL ACADEMY IN ARTESIA,

13   NEW MEXICO, AND I WAS INSTRUCTED IN IMMIGRATION LAW, IMPLIED

14   AUTHORITY, FIREARMS AND DRIVING.

11:31:10   15   Q.   ALL RIGHT.  NOW, AS FAR AS YOUR BORDER PATROL TRAINING AND

16   PART OF YOUR BORDER PATROL CAREER, WERE YOU TRAINED TO CONDUCT

17   INTERVIEWS OF DEFENDANTS THAT HAVE BEEN ARRESTED?

18   A.   YES.

19   Q.   HAVE YOU EVER CONDUCTED SUCH INTERVIEWS?

20   A.   YES.

21   Q.   APPROXIMATELY HOW MANY?

22   A.   40, 50.

23   Q.   ALL RIGHT.  DO YOU EVER CONDUCT THOSE INTERVIEWS IN

24   SPANISH?

25                MR. STITT:  SORRY TO INTERRUPT.  I DIDN'T HEAR YOUR

```
11:31:37   1   RESPONSE.
           2           THE WITNESS:  APPROXIMATELY 50.  I'M SORRY.
           3   BY MR. BENJAMIN:
           4   Q.  DO YOU EVER CONDUCT THOSE IN SPANISH?
           5   A.  YES.
           6   Q.  AND LET'S TALK ABOUT YOUR BACKGROUND IN SPANISH.  WHEN DID
           7   YOU FIRST LEARN SPANISH?
           8   A.  SO SPANISH WAS MY FIRST LANGUAGE.  BOTH MY PARENTS ARE
           9   MEXICAN SO IT'S MY FIRST LANGUAGE.
          10   Q.  ARE YOU A NATIVE SPANISH SPEAKER?
          11   A.  YES.
          12   Q.  ARE YOU FLUENT IN SPANISH?
          13   A.  YES.
          14   Q.  SO WHERE ARE YOU CURRENTLY ASSIGNED?
11:32:02  15   A.  I'M OUT OF THE CHULA VISTA BORDER PATROL STATION.
          16   Q.  ALL RIGHT.  AND ON SUNDAY OCTOBER 18TH, AT AROUND 11:00 IN
          17   THE MORNING, WERE YOU ON DUTY?
          18   A.  YES.
          19   Q.  WHERE WERE YOU?
          20   A.  I WAS IN THE CHULA VISTA BORDER PATROL STATION PROCESSING
          21   AREA.
          22   Q.  AT THAT TIME DID YOU COME INTO CONTACT WITH GUSTAVO
          23   LAZCANO-NERIA?
          24   A.  YES.
          25   Q.  I'M GOING TO ASK YOU TO LOOK AROUND THE COURTROOM IN A
```

```
11:32:28   1   MOMENT AND SEE IF YOU CAN IDENTIFY ANYONE IN THIS COURTROOM AS
           2   BEING THE GUSTAVO LAZCANO-NERIA THAT YOU SPOKE TO.
           3            THE COURT:  WOULD EVERYONE PLEASE REMOVE YOUR MASKS?
           4   MASKS ARE REMOVED.
           5            THE WITNESS:  YES, THE GENTLEMAN SITTING HERE WITH
           6   THE BLACK SHIRT.
           7            MR. BENJAMIN:  YOUR HONOR, MAY THE RECORD REFLECT
           8   HE'S IDENTIFIED THE DEFENDANT?
           9            THE COURT:  THE RECORD WILL SO REFLECT AND EVERYONE
          10   SHOULD REPLACE THEIR MASKS PLEASE.
          11   BY MR. BENJAMIN:
          12   Q.  SO YOU SAID YOU SPOKE TO HIM AT AROUND 11:00 IN THE
          13   MORNING?
          14   A.  YES.
11:32:57  15   Q.  WHY DID IT TAKE THAT LONG TO GET TO TALK TO HIM AND DO AN
          16   INTERVIEW?
          17   A.  SO THAT MORNING WE HAD MANY APPREHENSIONS, AND THEN ALSO
          18   WHEN IT CAME TIME TO DO THE INTERVIEW WE WERE HAVING TECHNICAL
          19   ISSUES WITH OUR CAMERA.
          20   Q.  ALL RIGHT.  YOU SAID YOU HAD MANY APPREHENSIONS, WERE THERE
          21   ENOUGH STAFF TO HANDLE EACH OF THOSE INTERVIEWS AT THE TIME
          22   SAME TIME?
          23   A.  NO.
          24   Q.  YOUR HONOR, AT THIS POINT THE GOVERNMENT WOULD ALSO ASK THE
          25   COURT TO TAKE JUDICIAL NOTICE THAT THERE IS NO MAGISTRATE
```

11:33:29   1   CALENDAR ON SUNDAY MORNING OF THE 18TH.

2          THE COURT:  ANY OBJECTION?

3          MR. STITT:  NO OBJECTION.

4          THE COURT:  OKAY.  THE COURT WILL TAKE JUDICIAL

5   NOTICE THAT THERE WAS NO COURT, THERE WAS NO COURT CALENDAR FOR

6   THE MAGISTRATE DUTY JUDGE ON OCTOBER 18TH, 2020.

7   BY MR. BENJAMIN:

8   Q.  THANK YOU, YOUR HONOR.  NOW WHEN YOU SPOKE TO THE

9   DEFENDANT, DID YOU READ HIM HIS MIRANDA WARNINGS?

10   A.  I DID.

11   Q.  DID YOU INFORM HIM THAT HE HAD THE RIGHT TO REMAIN

12   SILENT?

13   A.  I DID.

14   Q.  DID YOU INFORM HIM THAT ANYTHING HE SAID COULD BE USED

11:33:54   15   AGAINST HIM?

16   A.  YES.

17   Q.  DID YOU INFORM HIM THAT HE HAD THE RIGHT TO AN ATTORNEY

18   BEFORE AND DURING ANY QUESTIONING?

19   A.  YES.

20   Q.  DID YOU INFORM HIM THAT IF HE COULDN'T AFFORD AN ATTORNEY,

21   AN ATTORNEY WOULD BE PROVIDED TO HIM FREE OF CHARGE?

22   A.  YES.

23   Q.  AND DID YOU INFORM HIM THAT HE HAD THE RIGHT TO TERMINATE

24   QUESTIONING AND TALK TO AN ATTORNEY AT ANY TIME?

25   A.  YES.

11:34:11   1    Q.   WHAT LANGUAGE WERE YOU TELLING HIM THIS IN?

2    A.   SPANISH.

3    Q.   AND AFTER YOU READ HIM THE WARNINGS FOR THE FIRST TIME, DID

4    HE SEEM TO HAVE ANY CONFUSION?

5    A.   YES.   I WANTED TO MAKE SURE HE UNDERSTOOD SO I READ HIM ALL

6    HIS RIGHTS A SECOND TIME.

7    Q.   OKAY.   AND AFTER YOU READ HIM THE SECOND TIME THE WARNINGS,

8    DID THAT SEEM TO CLEAR UP ANY CONFUSION HE HAD?

9    A.   YES.

10   Q.   AFTER YOU -- SO WHILE YOU WERE SPEAKING TO HIM, WHAT TONE

11   WERE YOU TALKING IN?

12   A.   A REGULAR SPEAKING TONE.

13   Q.   DID YOU EVER RAISE YOUR VOICE TO HIM?

14   A.   NO.

11:34:39   15   Q.   YELL AT HIM?   SHOUT AT HIM?

16   A.   NO.

17   Q.   DID YOU HAVE ANY WEAPONS DRAWN AT ANY POINT IN THIS

18   INTERVIEW?

19   A.   NO.

20   Q.   DID YOU EVER THREATEN HIM IN ANY WAY?

21   A.   NO.

22   Q.   DID YOU EVER PROMISE HIM ANYTHING IF HE WAIVED HIS MIRANDA

23   RIGHT TO SPEAK TO YOU?

24   A.   NO.

25   Q.   WHEN YOU SPOKE TO HIM, DID HE AGREE AFTER YOU READ HIM HIS

| | | |
|---|---|---|
| 11:34:57 | 1 | RIGHTS THE SECOND TIME AND HE INDICATED THAT HE UNDERSTOOD |
| | 2 | THEM, DID HE AGREE TO TALK TO YOU? |
| | 3 | A.  YES. |
| | 4 | Q.  AND DID YOU ASK HIM ABOUT HIS CITIZENSHIP? |
| | 5 | A.  I DID. |
| | 6 | Q.  WHAT WAS THAT CONVERSATION?  WHAT DID YOU ASK AND WHAT DID |
| | 7 | HE SAY? |
| | 8 | A.  I ASKED HIM OF WHAT COUNTRY HE'S A CITIZEN OF AND HE SAID |
| | 9 | MEXICO. |
| | 10 | Q.  DID YOU ASK HIM WHAT COUNTRY HIS PARENTS WERE CITIZENS |
| | 11 | OF? |
| | 12 | A.  YES. |
| | 13 | Q.  WHAT COUNTRY DID HE SAY THEY WERE CITIZENS OF? |
| | 14 | MR. STITT:  YOUR HONOR, I DON'T KNOW HOW THE COURT |
| 11:35:19 | 15 | WANTS TO ADDRESS IT, BUT I DO HAVE AN OBJECTION UNDER MIRANDA |
| | 16 | TO THE POST-ARREST STATEMENT COMING IN, AND THAT'S WHAT I |
| | 17 | BELIEVE MR. BENJAMIN HAS NOW TRANSITIONED TO.  I DON'T KNOW HOW |
| | 18 | YOU WOULD LIKE TO ADDRESS IT.  WOULD YOU LIKE ME TO JUST LET |
| | 19 | THE TESTIMONY COME IN AND THEN QUESTION HIM ABOUT IT? |
| | 20 | THE COURT:  SINCE IT'S A BENCH TRIAL, DO YOU FEEL |
| | 21 | LIKE YOU NEED TO HAVE A FULL RECORD BEFORE YOU MAKE YOUR |
| | 22 | ARGUMENT OR ARE YOUR READY TO MAKE YOUR ARGUMENT NOW? |
| | 23 | MR. STITT:  I'M LARGELY READY TO MAKE MY ARGUMENT |
| | 24 | NOW. |
| | 25 | THE COURT:  OKAY.  WELL, LET'S TAKE A PAUSE, AND IF |

55

11:35:53   1   YOU HAVE AN OBJECTION TO ADMISSION OF ANY FURTHER TESTIMONY --

2   MR. STITT:  I HAVE A COUPLE OF TRANSCRIPTS THAT I'D

3   LIKE TO PRODUCE.  I'VE GIVEN THE GOVERNMENT A COPY, AND IT WAS

4   PREPARED THIS MORNING BY A COURT-CERTIFIED INTERPRETER.  THERE

5   IS A TYPOGRAPHICAL ERROR THAT DID NOT CHANGE THE INTERPRETATION

6   OF THE TRANSLATION, AND I'LL POINT IT OUT TO THE PARTIES AND

7   THEN I CAN SUBMIT A COPY WITHOUT THE TYPOGRAPHICAL ERROR.  IN

8   THE FIRST PARAGRAPH ON THE RIGHT-HAND SIDE THREE QUARTERS OF

9   THE WAY DOWN IT SAYS, YOU WILL ALWAYS STILL HAVE THE RIGHT TO

10   STOP ANSWERING WHATEVER YOU LIE, AND IT SHOULD READ WHATEVER

11   YOU LIKE.  I DON'T BELIEVE THAT THAT IS THE SUBSTANCE OR I

12   THINK DETERMINATIVE OF MY ARGUMENT.  I CAN PROFFER THAT THIS

13   STATEMENT, THIS RECITATION OF MIRANDA RIGHTS WHICH IS THE FIRST

14   PARAGRAPH IS THE FIRST TIME THAT THE GOVERNMENT AGENT READ THE

11:36:40  15   MIRANDA RIGHTS TO MY CLIENT.  AND THEN HE ASKS, MY CLIENT ASKS

16   THAT HE HAS A QUESTION.  AND IN RESPONSE THE AGENT SAYS THAT A

17   LAWYER CAN BE PROVIDED BUT THAT MR. LAZCANO MUST ANSWER ALL OF

18   THE QUESTIONS.  AND SO IT'S ESSENTIALLY THAT MR. LAZCANO EITHER

19   HAS TO ANSWER ALL OF THE QUESTIONS THEN OR LATER WITH A LAWYER.

20   THIS DIRECTLY CONFLICTS WITH THE ADVISAL TO REMAIN

21   SILENT, AND MR. LAZCANO ANSWERED THE REMAINING QUESTIONS WHICH

22   IS THE POST-MIRANDA INTERVIEW UNDER THE BELIEF THAT HE WAS

23   REQUIRED TO ANSWER THEM WITH A LAWYER OR ANSWER THEM THEN

24   WITHOUT A LAWYER.  AND IN HIS VIEW, HE'S GOT TO ANSWER THEM ONE

25   WAY OR ANOTHER, MIGHT AS WELL GET IT DONE THAT MORNING.  THAT'S

|          |    |                                                                              |
|----------|----|------------------------------------------------------------------------------|
| 11:37:26 | 1  | CLEARLY NOT THE ADVISAL UNDER MIRANDA, AND I DON'T THINK, IN                  |
|          | 2  | LIGHT OF THIS RESPONSE TO MR. LAZCANO'S QUESTION, THE                         |
|          | 3  | GOVERNMENT CAN MEET ITS BURDEN TO SHOW COMPLIANCE WITH MIRANDA                |
|          | 4  | AND A KNOWING AND VOLUNTARY WAIVER BEFORE ADMISSION OF THE                    |
|          | 5  | STATEMENT.                                                                    |
|          | 6  | THE COURT:  OKAY.  MR. BENJAMIN, WHAT'S YOUR                                  |
|          | 7  | RESPONSE?                                                                     |
|          | 8  | MR. BENJAMIN:  YOUR HONOR, I HAVE NOT HAD AN                                  |
|          | 9  | OPPORTUNITY TO COMPARE THIS TRANSCRIPT WITH THE VIDEO AND SEE                 |
|          | 10 | WHAT WAS SAID IN THE VIDEO.  AND ALSO, FROM WATCHING THE VIDEO                |
|          | 11 | FROM THE TIME IT APPEARS THERE WAS SOME CONFUSION AS TO -- HE                 |
|          | 12 | HAD SOME AMOUNT OF CONFUSION AND THEN IN SPEAKING, THEN THE                   |
|          | 13 | AGENT RE-READ HIS RIGHTS AND THEN YOU CAN SORT OF SEE VISUALLY                |
|          | 14 | THAT HE'S NOW FOLLOWING ALONG BETTER.  SO I DON'T KNOW THAT                   |
| 11:38:09 | 15 | THIS IS NECESSARILY AN ACCURATE SUMMATION OF IT.  I CAN CLARIFY               |
|          | 16 | WITH THE AGENT WHETHER HE TOLD HIM SPECIFICALLY HE HAD TO                     |
|          | 17 | ANSWER ONE WAY OR THE OTHER OR --                                             |
|          | 18 | THE COURT:  LET ME TAKE A LOOK REAL QUICK.                                    |
|          | 19 | MR. STITT:  I'M HAPPY TO CALL THE INTERPRETER AS A                           |
|          | 20 | WITNESS.  I CAN HAVE HIM COME OVER NOW.  THE GOVERNMENT IS                    |
|          | 21 | CERTAINLY ABLE TO QUESTION HIM IF IT WOULD LIKE.  IT'S ALSO THE              |
|          | 22 | GOVERNMENT'S CASE-IN-CHIEF, BUT I UNDERSTAND IT'S A BENCH TRIAL              |
|          | 23 | AND WE'RE DOING A MOTION HEARING AS WELL.  SO HOWEVER THE COURT              |
|          | 24 | WOULD LIKE, I'M HAPPY TO PUT ON AFFIRMATIVE EVIDENCE WITH                     |
|          | 25 | RESPECT TO THE TRANSCRIPTION.                                                 |

11:38:44   1          THE COURT:  I'M ONLY LOOKING AT THIS FOR THE PURPOSE

       2   OF ASCERTAINING WHETHER THE POST-MIRANDA STATEMENTS ARE

       3   ADMISSIBLE.  LET ME JUST TAKE A LOOK AT THIS.  WHERE DO YOU

       4   THINK, MR. STITT, THAT HE TOLD HIM THAT HE HAD TO ANSWER ALL

       5   THE QUESTIONS?

       6          MR. STITT:  SO THE FIRST PARAGRAPH IS THE STANDARD

       7   MIRANDA ADVISEMENT --

       8          THE COURT:  NO, I KNOW THAT.

       9          MR. STITT:  -- AND IT'S FOLLOWING THAT, AND MY CLIENT

      10   SAYS, I HAVE A QUESTION, THE AGENT SAYS, TELL ME OR GO AHEAD,

      11   AND MY CLIENT SAYS, IN OTHER WORDS, IF ONE QUESTION I DON'T

      12   WANT TO ANSWER IT, I DON'T ANSWER IT?  AND THEN IN RESPONSE,

      13   THE AGENT SAYS, YES, SO YOU DON'T WANT TO ANSWER QUESTIONS YOU

      14   DON'T ANSWER THEM UNTIL YOU HAVE YOUR LAWYER.  AND MY CLIENT

11:39:35  15   ASKS FOR FURTHER CLARIFICATION AND SAYS, I DON'T, I DON'T

      16   ANSWER IT AND MAYBE THE NEXT TIME I DON'T?  AND THE AGENT

      17   INTERJECTS AND SAYS, NO, THAT'S NOT, THAT CAN'T, THAT CAN'T BE

      18   CHOSEN OR SELECTED.  AND THEN HE RE-READS THE SAME MIRANDA

      19   ADVISEMENT AGAIN.  MY CLIENT SIGNS THE MIRANDA WAIVER AND

      20   ANSWERS QUESTIONS.  OUR ARGUMENT IS THAT THESE RESPONSES FROM

      21   AGENT RIVAS TO THE EFFECT OF TELLING MR. LAZCANO THAT HE HAS TO

      22   ANSWER QUESTIONS, AND HE CAN WAIT FOR A LAWYER BUT THEN HE HAS

      23   TO ANSWER THE QUESTIONS, CONFLICTS WITH HIS RIGHT TO REMAIN

      24   SILENT AND THAT THE GOVERNMENT, IN LIGHT OF THIS CONFLICTING

      25   ADVISAL, CAN'T SHOW THAT IT COMPLIED WITH MIRANDA AND THAT

11:40:26   1   THERE'S A KNOWING AND VOLUNTARY WAIVER OF MIRANDA.

2        THE COURT:  BUT IT'S MY UNDERSTANDING HE STOPPED THE

3   TRANSCRIPTION AFTER THIS BUT THE REST OF THE INTERVIEW WOULD

4   SHOW THAT THAT MIRANDA ADVISAL THAT'S ON THE FIRST PAGE WAS

5   GIVEN A SECOND TIME; CORRECT?

6        MR. STITT:  CORRECT.  AND THAT I CAN PROFFER THAT

7   SIMILAR QUESTIONS WERE NOT ASKED AGAIN WITH RESPECT TO THE

8   RIGHT TO REMAIN SILENT.  I DON'T ALLEGE THAT THE INTERVIEW WAS

9   INVOLUNTARY OR ANYTHING OF THE SORT; SIMPLY, WE'RE ALLEGING

10   THAT THIS IS A CONFLICTING ADVISAL.  IT SAYS, YOU HAVE THE

11   RIGHT TO REMAIN SILENT AND THEN MR. LAZCANO ASKS FOR

12   CLARIFICATION AND THIS IS THE CLARIFICATION HE GETS.  HE'S THEN

13   READ EXACTLY THE SAME RIGHTS AGAIN AND SPEAKS TO AGENT RIVAS.

14   I DON'T THINK THAT IN LIGHT OF THIS CONFLICTING ADVICE THAT HE

11:41:20  15   RECEIVED SANDWICHED BETWEEN THE TWO STANDARD MIRANDA ADVISALS

16   THAT THE GOVERNMENT CAN SHOW THAT HE KNOWINGLY AND VOLUNTARY

17   WAIVED MIRANDA.  IT'S THE GOVERNMENT'S BURDEN TO SHOW A KNOWING

18   AND VOLUNTARY WAIVER.  SO AMBIGUITIES, OR YOU KNOW, CONFUSION,

19   IT CUTS AGAINST THE GOVERNMENT AT THIS POINT.  THEY HAVE TO

20   SHOW COMPLIANCE.

21        MR. BENJAMIN:  YOUR HONOR, THAT IS GENERALLY CORRECT.

22   BUT AS YOUR HONOR POINTED OUT, THERE IS THEN A RE-ADVISAL OF

23   MIRANDA.  AND I THINK JUST EVEN FROM THE TRANSCRIPT IT'S NOT A

24   CLEAR STATEMENT OF, NO, YOU NEED TO ANSWER THESE QUESTIONS.

25   THE DEFENDANT ASKS, IF I DON'T WANT TO ANSWER THE QUESTIONS, DO

11:41:57   1   I NOT HAVE TO?  AND THEN THE AGENT SAYS, WELL, YOU DON'T HAVE

2   TO ANSWER ANYTHING UNTIL YOU HAVE AN ATTORNEY.  THAT'S NOT A

3   DIRECT STATEMENT OF, YOU ARE GOING TO NEED TO ANSWER QUESTIONS.

4   THAT'S AN ATTEMPT TO ANSWER THAT QUESTION AND THEN ULTIMATELY,

5   AS THE AGENT TESTIFIED AND AS IT SORT OF APPEARS FROM THIS SORT

6   OF MUDDLED BACK AND FORTH, HE TESTIFIED THAT IN ORDER TO MAKE

7   SURE THE DEFENDANT UNDERSTOOD, HE READ HIM THE RIGHTS EXACTLY

8   AS THEY ARE, AND THE DEFENDANT THEN SAID HE UNDERSTOOD.

9         I THINK THE BEST WAY OF RESOLVING AMBIGUITY IS IF HE

10   SAYS, I'M GOING TO READ TO YOU EXACTLY WHAT THE LAW SAYS YOUR

11   RIGHTS ARE AND THEN THE DEFENDANT SAYS, I UNDERSTAND MY RIGHTS.

12   THAT CURES WHATEVER AMBIGUITY THERE IS BECAUSE HE'S NOW BEEN

13   EXPLICITLY READ HIS RIGHTS AN ESSENTIALLY A VERBATIM

14   TRANSLATION OF WHAT HIS MIRANDA RIGHTS ARE AND NOW SAYS HE

11:42:48 15   UNDERSTANDS THEM.

16         THE COURT:  SO LET ME JUST SAY I THINK I HEARD ENOUGH

17   AND REVIEWED THE TRANSCRIPT THAT WAS PROVIDED.  WHAT APPEARS ON

18   THE TRANSCRIPT IS THAT THE DEFENDANT HAD QUESTIONS ABOUT --

19   WELL, FIRST HE WAS TOLD BY AGENT RIVAS IF YOU DON'T WANT TO

20   ANSWER QUESTIONS, YOU DON'T ANSWER THEM UNTIL YOU HAVE YOUR

21   ATTORNEY.  AND THEN MR. LAZCANO ASKED, I'M REFERRING TO ALL OF

22   THEM, OR FOR EXAMPLE, YOU ASK ME, I DON'T KNOW, HEY, SO IS LIKE

23   THIS OR LIKE THAT, AND AGENT RIVAS SAYS, NO, WELL; AND THEN

24   LAZCANO SAYS, THE DEFENDANT SAYS, I DON'T, I DO ANSWER IT AND

25   THEN MAYBE THE NEXT TIME I DON'T.  AND WHAT AGENT RIVAS TELLS

```
11:43:27   1   HIM IS, NO, THAT CAN'T BE.

           2             AND I DON'T SEE THAT HAS CONFLICTING, AND I SEE THE

           3   SECOND MIRANDA WARNING AS BEING CORRECTIVE OF ANY CONFUSION

           4   BECAUSE IN THE SECOND MIRANDA WARNING, ASSUMING IT WAS THE SAME

           5   LANGUAGE AS THE FIRST, HE WAS TOLD AGAIN YOU HAVE THE RIGHT TO

           6   REMAIN SILENT.  ANYTHING YOU SAY CAN BE USED AGAINST YOU.  YOU

           7   HAVE THE RIGHT TO SPEAK WITH AN ATTORNEY BEFORE WE ASK YOU ANY

           8   QUESTIONS AND TO HAVE HIM PRESENT WITH YOU DURING THE

           9   QUESTIONS.  IF YOU DON'T HAVE THE MONEY TO HIRE AN ATTORNEY,

          10   ONE CAN BE PROVIDED TO YOU BEFORE WE ASK YOU ANY QUESTIONS IF

          11   YOU SO WISH.  IF YOU DECIDE TO ANSWER OUR QUESTIONS NOW WITHOUT

          12   HAVING AN ATTORNEY PRESENT, YOU WILL HAVE THE RIGHT TO STOP

          13   ANSWERING WHENEVER YOU LIKE.  YOU ALSO HAVE THE RIGHT TO STOP

          14   ANSWERING WHENEVER YOU LIKE UNTIL YOU'RE ABLE TO SPEAK WITH AN

11:44:14  15   ATTORNEY.  SO I THINK THAT THOSE INSTRUCTIONS DIRECTLY ANSWERED

          16   HIS QUESTIONS AND CLARIFIED ANY DOUBT HE HAD.  IF HE HAD

          17   PROCEEDED AT THAT POINT WITHOUT GIVING HIM ANY MORE MIRANDA

          18   INSTRUCTIONS, I THINK WE WOULD HAVE A DIFFERENT PROBLEM.  BUT I

          19   DON'T SEE A PROBLEM ON THIS RECORD.  SO I'LL OVERRULE THE

          20   OBJECTION.  YOU CAN PROCEED.

          21   BY MR. BENJAMIN:

          22   Q.  SO WE WERE TALKING ABOUT CITIZENSHIP LAST.  DID HE INDICATE

          23   WHERE HIS PARENTS WERE CITIZENS OF?

          24   A.  YES.  MR. LAZCANO MENTIONED HIS PARENTS WERE MEXICAN.

          25   Q.  DID YOU ASK HIM HOW HE ENTERED THE UNITED STATES?
```

11:44:50  1    A.  YES.

         2    Q.  WHAT DID HE TELL YOU?

         3    A.  HE TOLD ME HE MADE ENTRY BY WALKING AROUND A U.S.-MEXICO

         4    INTERNATIONAL BOUNDARY WHERE THE CONSTRUCTION HAD NOT FINISHED.

         5    THERE'S A LOT OF CONSTRUCTION IN THE AREA, AND THERE'S GAPS.

         6             THE COURT:  I'M SORRY.  I'M HAVING A HARD TIME

         7    HEARING YOU.  CAN YOU REPEAT THAT ANSWER?

         8             THE WITNESS:  YES.  SO MR. LAZCANO SAID HE MADE ENTRY

         9    BY WALKING AROUND THE U.S.-MEXICO INTERNATIONAL BOUNDARY FENCE.

        10    BY MR. BENJAMIN:

        11    Q.  DID HE INDICATE WHETHER HE ENTERED AT A PORT OF ENTRY OR

        12    NOT AT A PORT OF ENTRY?

        13    A.  I ASKED HIM THAT LATER.  IT'S NOT A PORT OF ENTRY.  IT'S

        14    WHERE THERE'S A GAP IN THE FENCE.  THAT'S WHERE HE WALKED

11:45:28 15    AROUND.

        16    Q.  DID YOU ASK HIM WHY I ENTERED?

        17    A.  HE STATED HE WAS GOING TO WASHINGTON, THE STATE OF

        18    WASHINGTON.

        19    Q.  DID HE EVER INDICATE TO YOU THAT HE WAS PLANNING ON TURNING

        20    HIMSELF IN TO THE BORDER PATROL?

        21    A.  NO.

        22    Q.  DID HE EVER INDICATE TO YOU THAT HE HAD THE INTENT TO GO

        23    INTO CUSTODY?

        24    A.  NO.

        25    Q.  DID YOU ASK HIM WHY, WHAT HE WAS GOING IT DO WHEN HE WAS IN

11:45:52  1  WASHINGTON OR WHY HE WAS HERE?

2  A.  TO WORK.

3  Q.  ALL RIGHT.  DID YOU ASK HIM WHETHER HE HAD ANY LEGAL

4  PERMISSION TO ENTER THE UNITED STATES OR TO STAY IN THE UNITED

5  STATES?

6  A.  YES.

7  Q.  WHAT DID HE TELL YOU?

8  A.  HE SAID NO.

9  Q.  THANK YOU.  NOTHING FURTHER.

10       MR. STITT:  YOUR HONOR, I DON'T HAVE ANY QUESTIONS.

11       THE COURT:  OKAY.  ALL RIGHT.  SO NO QUESTIONS?

12  OKAY.  SO THAT IS ALL FOR -- MAY THIS WITNESS BE EXCUSED?

13       MR. BENJAMIN:  YES, YOUR HONOR.

14       THE COURT:  OKAY.  YOU MAY BE EXCUSED, AGENT RIVAS.

11:46:25  15  THANK YOU.

16       THE CLERK:  CAN YOU WIPE DOWN YOUR AREA PLEASE?

17       THE COURT:  THERE'S FRESH WIPES RIGHT THERE.  DOES

18  THE GOVERNMENT HAVE ANY OTHER WITNESSES?

19       MR. BENJAMIN:  YES, YOUR HONOR.  ONE MORE THAT WILL

20  BE QUITE BRIEF.  THE GOVERNMENT CALLS CHRIS MODROW TO THE

21  STAND, BORDER PATROL AGENT MODROW.

22       (OATH ADMINISTERED.)

23       THE CLERK:  PLEASE STATE YOUR FULL NAME, SIR.

24       THE WITNESS:  IT IS CHRISTOPHER MODROW.  MY LAST NAME

25  IS SPELLED, M-O-D-R-O-W.

11:47:52  1    THE COURT:  GO AHEAD.  PROCEED.

2                     DIRECT EXAMINATION

3  BY MR. BENJAMIN:

4  Q.  THANK YOU, YOUR HONOR.  AGENT MODROW, WHAT DO YOU DO FOR A

5  LIVING?

6  A.  I WORK WITH THE U.S. BORDER PATROL.

7  Q.  HOW LONG HAVE YOU WORKED FOR THE BORDER PATROL?

8  A.  12 YEARS.

9  Q.  WHAT IS YOUR CURRENT ASSIGNMENT WITH THE BORDER PATROL?

10  A.  I'M ASSIGNED TO THE UNITED STATES ATTORNEY'S OFFICE.

11  Q.  WHAT ARE YOUR DUTIES THERE?

12  A.  MY DUTIES ARE AS AN A-FILE CUSTODIAN.

13  Q.  LET'S START WITH WHAT AN A-FILE IS IF YOU'RE A CUSTODIAN OF

14  IT.  WHAT IS AN A-FILE?

11:48:20  15  A.  AN A-FILE IS A FILE THAT CONSISTS OF THE CHRONOLOGICAL

16  IMMIGRATION HISTORY OF AN ALIEN DEALING WITH THE SERVICE.

17  Q.  OKAY.  AND HOW ARE THOSE FILES IDENTIFIED?  IS THERE A

18  UNIQUE IDENTIFIER FOR EACH A-FILE?

19  A.  YES, THERE IS.  THEY'RE IDENTIFIED BY AN 8-TO-9 DIGIT

20  BASICALLY ALPHA, I'M SORRY, NUMERICAL IDENTIFIER.  SIMILAR TO A

21  SOCIAL SECURITY NUMBER.  BASICALLY AN 8-TO-9 DIGIT NUMBER.

22  Q.  AND THAT NUMBER, IS THAT UNIQUE TO ONE PARTICULAR ALIEN?

23  A.  IT IS.

24  Q.  IS THAT CONSISTENT EVERY TIME THAT ALIEN HAS CONTACT WITH

25  THE U.S. GOVERNMENT?  IT WILL ALWAYS BE UNDER THAT SAME

```
11:48:57   1   A-NUMBER?

           2   A.   THAT'S CORRECT.

           3   Q.   IN YOUR CAPACITY AS AN A-FILE CUSTODIAN, HAVE YOU REVIEWED

           4   A-FILES?

           5   A.   I HAVE.

           6   Q.   ARE YOU FAMILIAR WITH HOW THEY WORK?

           7   A.   I AM.

           8   Q.   ARE YOU THE CUSTODIAN OF RECORDS FOR AN A-FILE NUMBER

           9   216894266?

          10   A.   I AM.

          11   Q.   WHAT NAME IS THAT A-FILE ASSOCIATED WITH?

          12   A.   CAN I REVIEW THE PAPERWORK FOR THAT?

          13   Q.   IF THAT WOULD REFRESH YOUR RECOLLECTION.

          14   A.   YES, IT WOULD.

11:49:21  15   Q.   DO YOU HAVE THE PAPER WITH YOU?

          16   A.   I DO NOT.

          17   Q.   THAT MAY BE SLIGHTLY CHALLENGING THEN.

          18   A.   ACTUALLY, I DO KNOW IT.

          19   Q.   WHAT IS IT?

          20   A.   IT IS GUSTAVO LAZCANO-NERIA

          21   Q.   HAVE YOU REVIEWED MR. LAZCANO'S A-FILE?

          22   A.   I HAVE.

          23   Q.   HOW DID YOU COME INTO CUSTODY OF IT?

          24   A.   IT WAS ROUTED TO ME FROM THE STATION THAT IT ORIGINATED

          25   FROM WHICH IN THIS CASE WAS THE CHULA VISTA BORDER PATROL
```

11:49:48   1   STATION.

2   Q.   SO WAS IT DELIVERED TO YOU BY A DHS OR DOJ EMPLOYEE?

3   A.   YES, IT WAS.

4   Q.   ONCE IT ARRIVES IN YOUR CUSTODY, WHERE IS IT MAINTAINED?

5   A.   IN OUR OFFICE.

6   Q.   IS THAT OFFICE OPEN TO THE PUBLIC OR IS IT A SECURE

7   LOCATION?

8   A.   SECURE LOCATION.

9   Q.   AND WHO HAS ACCESS TO THAT AREA?

10   A.   ONLY US, ONLY PEOPLE WITHIN MY OFFICE.

11   Q.   OKAY.   NOW I WANT TO TALK TO YOU A LITTLE BIT ABOUT -- AND

12   YOU HAVE REVIEWED THE DOCUMENTS IN THAT SPECIFIC A-FILE?

13   A.   I HAVE.

14   Q.   I WANT TO TALK TO YOU ABOUT THE PROCESS OF AN ALIEN

11:50:19  15   ENTERING THE UNITED STATES, SPECIFICALLY A MEXICAN CITIZEN.

16   WOULD A MEXICAN CITIZEN REQUIRE ANY SORT OF ADVANCE PERMISSION

17   TO ENTER THE UNITED STATES LAWFULLY?

18   A.   I'M SORRY.   COULD YOU REPHRASE THAT QUESTION?

19   Q.   IF A MEXICAN CITIZEN WHO IS NOT ALSO A CITIZEN OF THE

20   UNITED STATES, WHO IS AN ALIEN, WANTED TO COME INTO THE UNITED

21   STATES LEGALLY AND BE ADMITTED THROUGH A PORT OF ENTRY, WOULD

22   THEY HAVE TO APPLY FOR SOMETHING?

23   A.   YES, THEY WOULD.

24   Q.   WHAT WOULD THEY HAVE TO APPLY FOR?

25   A.   FOR STATUS.

11:50:44    1    Q.  ALL RIGHT.  AND DOES THE GOVERNMENT MAINTAIN RECORDS OF

2    PEOPLE APPLYING FOR STATUS?

3    A.  THEY DO.

4    Q.  WHERE WOULD THOSE RECORDS BE MAINTAINED?

5    A.  SO IT WOULD BE MAINTAINED IN A DATABASE CALL CLAIMS.

6    Q.  OKAY.  ARE YOU FAMILIAR WITH THAT CLAIMS DATABASE?

7    A.  I AM.

8    Q.  DO YOU USE IT IN THE REGULAR COURSE OF YOUR BUSINESS?

9    A.  I DO.

10    Q.  IS ALL OF THE INFORMATION THAT IS IN THE CLAIMS DATABASE

11    INFORMATION THAT'S PUT IN BY GOVERNMENT EMPLOYEES, EITHER

12    EMPLOYEES OF DHS OR DOJ?

13    A.  THEY ARE.

14    Q.  IS THAT PUT IN BY THOSE EMPLOYEES IN THE COURSE OF THEIR

11:51:12    15    REGULAR DUTIES?

16    A.  YES.

17    Q.  IS IT PUT IN CLOSE IN TIME TO WHATEVER THE EVENT RECORDS?

18    A.  YES, THEY ARE.

19    Q.  IS IT PUT IN BY SOMEONE WHO HAS PERSONAL KNOWLEDGE OF WHAT

20    THEY'RE INPUTTING INTO THE DATABASE?

21    A.  YES.

22    Q.  IS THE DEPARTMENT OF HOMELAND SECURITY AND ANY OTHER

23    AGENCIES THAT HAVE ACCESS TO THAT DATABASE, ARE THEY UNDER A

24    DUTY TO REPORT TRUTHFULLY AND ACCURATELY ALL OF THAT

25    INFORMATION?

11:51:30   1   A.  YES, THEY ARE.

2   Q.  ARE YOU TRAINED IN ACCESSING THAT DATABASE?

3   A.  YES, I AM.

4   Q.  DID YOU PERSONALLY SEARCH THE CLAIMS DATABASE TO SEE

5   WHETHER THERE WAS AN APPLICATION FOR ADMISSION INTO THE UNITED

6   STATES FILED BY MR. GUSTAVO LAZCANO-NERIA?

7   A.  I DID.

8   Q.  WHEN DID YOU DO THAT SEARCH?

9   A.  THIS MORNING.

10   Q.  BASED ON THAT DATABASE SEARCH, IS THERE ANY INDICATION THAT

11   MR. LAZCANO-NERIA HAD ANY PERMISSION TO ENTER THE UNITED STATES

12   LAWFULLY AS OF OCTOBER 18TH OF THIS YEAR?

13   A.  THERE IS NOT.

14   Q.  THANK YOU.  NOTHING FURTHER.

11:52:00   15           THE COURT:  ANY CROSS-EXAMINATION?

16           MR. STITT:  YES, YOUR HONOR.  JUST VERY BRIEFLY.

17                 CROSS-EXAMINATION

18   BY MR. STITT:

19   Q.  IN YOUR EXPERIENCE REVIEWING A-FILES, YOU'VE SEEN LOTS OF

20   VARIOUS IMMIGRATION DOCUMENTS IN THEM, RIGHT?

21   A.  CORRECT.

22   Q.  AND COMMON DOCUMENTS WOULD BE BIRTH CERTIFICATES?

23   A.  THAT'S CORRECT.

24   Q.  ORDERS OF DEPORTATION?

25   A.  YES.

11:52:26  1   Q.   VERIFICATION OF PEOPLE HAVING BEEN DEPORTED?

2   A.   THAT'S CORRECT.

3   Q.   AND VARIOUS OTHER DHS AND GOVERNMENT DOCUMENTS THAT ARE

4   GENERATED THROUGH SOMEONE'S DEPORTATION?

5   A.   THAT'S CORRECT.

6   Q.   THOSE DOCUMENTS, WHETHER THEY BE A BIRTH CERTIFICATE OR AN

7   IMMIGRATION JUDGE ORDER, THOSE DOCUMENTS CONFIRM SOMEONE'S

8   CITIZENSHIP, RIGHT?

9   A.   CORRECT.

10   Q.   AND IN THIS CASE, YOU DIDN'T REVIEW ANY OF THOSE DOCUMENTS

11   IN MR. LAZCANO'S A-FILE, RIGHT?

12   A.   CORRECT.

13   Q.   AND HE'S NEVER BEEN DEPORTED?

14   A.   PRIOR, NO.

11:53:03  15   Q.   AS FAR AS -- WELL, AS WE SIT HERE TODAY, HE'S NEVER BEEN

16   DEPORTED?

17   A.   CORRECT.

18   Q.   HE'S NEVER, TO THE BEST OF YOUR KNOWLEDGE, HAS SEEN AN

19   IMMIGRATION JUDGE THAT'S FOUND HIM TO NOT BE A UNITED STATES

20   CITIZEN?

21   A.   THAT'S CORRECT.

22   Q.   THERE'S CERTAINLY NO BIRTH CERTIFICATE THAT YOU REVIEWED,

23   RIGHT?

24   A.   NO, I DID NOT REVIEW ANY BIRTH CERTIFICATE.

25   Q.   AND IN BETWEEN HIS ARREST THIS OCTOBER AND YOUR SEARCH OF

11:53:28  1   THE DATABASE THIS MORNING, YOU DIDN'T AFFIRMATIVELY INVESTIGATE

2   MR. LAZCANO'S CITIZENSHIP, RIGHT?

3   A.  I REVIEWED THE INFORMATION THAT WAS AVAILABLE IN OUR

4   SYSTEM.

5   Q.  IN THE A-FILE?

6   A.  CORRECT.

7   Q.  AND IN THE CLAIMS DATABASE?

8   A.  THAT'S CORRECT.

9   Q.  BUT YOU DIDN'T CONTACT LIKE THE UNITED STATES CONSULATE OR

10   MEXICAN CONSULATE TO SEEK A BIRTH CERTIFICATE?

11   A.  NO.

12   Q.  YOU DIDN'T CONTACT ANY INVESTIGATIVE AGENCY TO REVIEW AND

13   VERIFY THE ABSENCE OF INFORMATION IN THE A-FILE, RIGHT?

14   A.  THAT'S CORRECT.  I DID NOT.

11:54:04 15   Q.  YOU DIDN'T SIMILARLY CONTACT ANY AGENCY TO INVESTIGATE OR

16   REVIEW THE VERACITY OF THE CLAIMS DATABASE WITH RESPECT TO MR.

17   LAZCANO'S ABSENCE OF PERMISSION TO ENTER THE UNITED STATES,

18   RIGHT?

19   A.  NO, I DID NOT.

20   Q.  AND YOUR TESTIMONY TODAY IS BASED SOLELY ON YOUR REVIEW OF

21   THE A-FILE IN THIS CASE, RIGHT?

22   A.  THAT'S CORRECT.

23   Q.  WHICH DOES NOT HAVE A BIRTH CERTIFICATE?

24   A.  CORRECT.

25   Q.  DOES NOT HAVE AN ORDER OF DEPORTATION?

11:54:31  1    A.  CORRECT.

2    Q.  AND BEFORE MR. LAZCANO WAS ARRESTED ON OCTOBER 18TH, THERE

3    WAS NO A-FILE, RIGHT?

4    A.  THAT'S CORRECT.

5    Q.  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

6              THE COURT:  THANK YOU.  ANY REDIRECT?

7              MR. BENJAMIN:  NO, YOUR HONOR.

8              THE COURT:  OKAY.  MAY THIS WITNESS BE EXCUSED?

9              MR. STITT:  YES, YOUR HONOR.  THANK YOU.

10             MR. BENJAMIN:  YES, YOUR HONOR?

11             THE COURT:  AT THIS TIME SHOULD WE TAKE A RECESS SO

12   THAT YOU CAN DETERMINE WHETHER OR NOT THAT INFORMATION WAS

13   PRODUCED IN DISCOVERY?

14             MR. BENJAMIN:  THIS WITNESS WAS THE LAST OF THE

11:55:05 15   GOVERNMENT WITNESSES.

16             THE COURT:  RIGHT.  BEFORE WE PROCEED -- WELL, WE'RE

17   JUST AT A BREAKING POINT.  SO WHAT I'M WONDERING IS SHOULD WE

18   RECONVENE AT 1:30, TAKE A RECESS AND RECONVENE AT 1:30 WHICH

19   WOULD GIVE YOU TIME TO SORT OUT WHERE YOU ARE ON THE JENCKS ACT

20   PRODUCTION OF THE REPORT FOR AGENT COURTNEY; SO WHEN YOU COME

21   BACK AT 1:30 YOU'LL HAVE UPDATE FOR ME ON THAT.

22             MR. BENJAMIN:  YES, YOUR HONOR.

23             THE COURT:  OKAY.  SO WE'LL BE IN RECESS UNTIL 1:30

24   P.M.

25             MR. STITT:  THANK YOU, YOUR HONOR.

11:55:32   1           (RECESS.)

2                 THE COURT:  OKAY.  SO DID THE GOVERNMENT REST?

3                 MR. BENJAMIN:  YES, YOUR HONOR.

4                 THE COURT:  OKAY.  BEFORE WE GET STARTED ON THE

5      DEFENSE CASE, WHERE ARE WE ON THE JENCKS ISSUE?

6                 MR. BENJAMIN:  IT APPEARS IT WAS MISCOMMUNICATION.  I

7      E-MAILED THE DOCUMENT TO MR. STITT LAST TUESDAY.  I THINK IT

8      JUST GOT LOST IN THE EMAIL.

9                 MR. STITT:  THAT'S ABSOLUTELY CORRECT.  THE DEFENSE

10     WOULD WITHDRAW THE JENCKS OBJECTION AS WELL AS THE RULE 16.  IT

11     WASN'T MAINTAINED IN DISCOVERY.  IN REVIEWING THE DISCOVERY, IT

12     WASN'T THERE, BUT I DID UNEQUIVOCALLY RECEIVE THE DOCUMENT.

13                THE COURT:  OKAY.  SO THAT'S DONE.  THAT WAS EASY.

14     THAT WAS A GOOD BREAK FOR ME THEN.  NOW MR. STITT, IT'S THE

13:38:03  15     GOVERNMENT'S TURN.  DO YOU HAVE ANY WITNESSES TO CALL?

16                MR. STITT:  I DO NOT.

17                THE COURT:  DEFENSE RESTS?

18                MR. STITT:  YES, IT DOES.

19                THE COURT:  OKAY.  CLOSING ARGUMENTS?

20                MR. BENJAMIN:  SO THIS BEING AN ATTEMPTED '25

21     MISDEMEANOR, THERE ARE FOUR ELEMENTS THAT THE GOVERNMENT NEEDS

22     TO PROVE -- THAT THE DEFENDANT WAS AN ALIEN, THAT HE INTENDED

23     TO ENTER AT A TIME AND PLACE OTHER THAN AS DESIGNATED, THAT HE

24     INTENDED TO BE FREE FROM OFFICIAL --

25                MR. STITT:  HOLD ON.  HE CAN'T HEAR YOU.

13:38:29  1                 (PAUSE IN THE PROCEEDINGS.)

2                 MR. BENJAMIN:  YES, YOUR HONOR.  AS I WAS SAYING, THE

3       GOVERNMENT HAS TO PROVE BOTH THE SPECIFIC INTENT TO ENTER AT A

4       TIME AND PLACE OTHER THAN AS DESIGNATED AND SPECIFIC INTENT TO

5       ENTER FREE FROM OFFICIAL RESTRAINT, AS WELL AS PROVING A

6       SUBSTANTIAL STEP TOWARDS ACHIEVING THOSE INTENTS.  IN THIS

7       CASE, SUBSTANTIAL STEP IS CLEARLY NOT THE ISSUE.  THE DEFENDANT

8       WAS FOUND ABOUT A MILE INTO THE UNITED STATES WHICH IS CLEARLY

9       A SUBSTANTIAL STEP TOWARDS ENTERING THE UNITED STATES.  AS TO

10      ALIENAGE, WE HAVE PRIMARILY THE DEFENDANT'S CONFESSION AFTER

11      MIRANDA.  HE INDICATED THAT HE IS A CITIZEN OF MEXICO, HIS

12      PARENTS ARE CITIZENS OF MEXICO.  HE DID NOT INDICATE THAT HE

13      WAS A UNITED STATES CITIZENS.  THAT'S CORROBORATED BY SEVERAL

14      THINGS.

13:39:34 15                 FIRSTLY, HIS IN-FIELD ADMISSION TO THE ARRESTING

16      AGENT AS HE SAID HE WAS FROM MEXICO AND HE'S IN THE UNITED

17      STATES ILLEGALLY.  IT'S ALSO CORROBORATED WHEN HE WAS ASKED FOR

18      IDENTIFICATION.  THE IDENTIFICATION HE PROVIDED, AND THAT'S

19      EXHIBIT 2, WAS A FORM OF I.D. THAT IS OBVIOUSLY NOT ISSUED BY

20      THE UNITED STATES OR BY ANY STATE OF THE UNITED STATES.  IT'S

21      ALSO CORROBORATED BY THE CIRCUMSTANCES IN WHICH HE WAS FOUND.

22      HE WAS FOUND IN AN AREA THAT THE ARRESTING AGENT TESTIFIED IS

23      ROUTINELY USED AND FREQUENTLY USED BY ALIENS ENTERING THE

24      UNITED STATES UNLAWFULLY.  HE IS IN THE MOUNTAINS, IN A REMOTE

25      AREA AT 3:00 IN THE MORNING.  NO CAMPING GEAR, NO LIGHTS, IN A

13:40:13  1   CIRCUMSTANCE THAT THE ARRESTING AGENT SAID IN OVER A DECADE AS

2   A BORDER PATROL AGENT HE HAS NEVER ENCOUNTERED UNITED STATES

3   CITIZENS IN THOSE CIRCUMSTANCES.  SO ALL OF THAT TOGETHER MAKES

4   IT QUITE CLEAR THAT THE DEFENDANT WAS AN ALIEN AS OF OCTOBER

5   18TH.

6           AS OF THE INTENT TO ENTER OTHER THAN AT A DESIGNATED

7   PORT OF ENTRY, AGAIN, THE DEFENDANT DID CONFESS TO THIS, AND

8   THE TESTIMONY WAS THAT HE TOLD THE AGENT THAT HE ENTERED BY

9   GOING AROUND THE BORDER FENCE WHERE THERE WAS A BREAK IN THE

10   FENCE DUE TO CONSTRUCTION.  THAT'S CORROBORATED BY THE

11   LOCATION, AGAIN, WHERE HE'S FOUND WHICH IS JUST NORTH OF A

12   BREAK IN THE BORDER FENCE.  AND AGAIN AS THE ARRESTING AGENT

13   TESTIFIED, HE HAS ARRESTED OTHER ALIENS WHO HAVE GONE AROUND

14   THE BORDER FENCE IN THAT AREA AND HAVE ENDED UP WHERE THE

13:40:57  15   DEFENDANT WAS FOUND.

16           TURNING TO THE ATTEMPT TO ENTER FREE FROM OFFICIAL

17   RESTRAINT, AGAIN, THE DEFENDANT DID CONFESS TO THIS ELEMENT OF

18   THE CRIME.  HE TOLD THE POST-MIRANDA AGENT THAT HE WAS ENTERING

19   TO GO TO WASHINGTON, THAT HE WAS ENTERING TO GO TO WORK.  HE

20   DID NOT SAY THAT HE WAS LOOKING TO TURN HIMSELF IN TO BORDER

21   PATROL OR LOOKING TO GO INTO CUSTODY.  THAT'S ALSO CORROBORATED

22   BY HIS ACTIONS AT THE TIME THAT HE IS ENCOUNTERED BY BORDER

23   PATROL.  AGAIN, HE IS IN THE BRUSH WITH NO LIGHT ON.  WHEN

24   BORDER PATROL APPROACHES, HE DOESN'T FLAG THEM DOWN.  HE

25   DOESN'T CALL OUT TO GET THEIR ATTENTION.  HE DOESN'T APPROACH

13:41:31  1    THEM.

2              IN FACT, HE TAKES OFF RUNNING AND THEN WHEN THE AGENT

3    AGAIN GOES TO ENCOUNTER HIM AFTER SECURING THE FIRST GROUP OF

4    PEOPLE, HE TAKES OFF RUNNING AGAIN.  SO IT'S VERY CLEAR THERE'S

5    NO INTENT TO ENTER CUSTODY AND SO HE'S LOOKING TO ENTER FREE

6    FROM OFFICIAL RESTRAINT.  AND AS SUCH, THE UNITED STATES HAS

7    PROVED EVERY ELEMENT OF THIS PROSECUTION.

8              THE COURT:  OKAY.

9              MR. STITT:  YES, YOUR HONOR.  JUST VERY BRIEFLY.

10   WITH RESPECT TO THE GOVERNMENT'S ARGUMENTS IN RESPECT TO THE

11   ENTRY AND IN RESPECT TO THE SUBSTANTIAL STEP, ABOUT THE

12   LOCATION, I THINK IT'S WELL-TAKEN, BUT THEY MISS PERHAPS ONE OF

13   THE MOST IMPORTANT ELEMENTS THAT THE GOVERNMENT HAS TO PROVE

14   WHICH IS ALIENAGE.  ALL OF THE EVIDENCE THAT THE GOVERNMENT

13:42:14 15   PRESENTED AS TO ALIENAGE IS MR. LAZCANO'S STATEMENTS.  THEY

16   HAVEN'T -- IN FACT, THERE'S TESTIMONY ABOUT THE A-FILE IN THIS

17   CASE WHICH IS CREATED AT THE TIME OF HIS ARREST.  THERE ARE NO

18   IMMIGRATION-RELATED DOCUMENTS ATTESTING TO HIS CITIZENSHIP IN

19   THE UNITED STATES OR ANYWHERE ELSE.  THERE'S NO BIRTH

20   CERTIFICATE.  THERE'S NO AFFIRMATIVE EVIDENCE OR INVESTIGATION

21   OF ALIENAGE APART FROM MR. LAZCANO'S ADMISSION.

22             HE ADMITTED HE WAS BORN IN MEXICO.  AND YOU DID HEAR

23   SOME TESTIMONY THAT PEOPLE BORN OUTSIDE OF THE UNITED STATES

24   CAN BECOME CITIZENS OF THE UNITED STATES CERTAINLY.  WE ALSO

25   HEARD TESTIMONY THAT THERE'S NO PENDING APPLICATION AS FAR AS

13:42:52  1   BORDER PATROL IS AWARE OR ANY OTHER INDICATION IN THE A-FILE

2   THAT MR. LAZCANO OBTAINED OR HAS STATUS TO BE IN THE UNITED

3   STATES.  AGAIN, I WOULD SAY THAT PROOF BEYOND A REASONABLE

4   DOUBT IS LACKING HERE WITH RESPECT TO ALIENAGE AND RELYING

5   EXCLUSIVELY ON MR. LAZCANO'S STATEMENTS FOR THAT.  I'LL SUBMIT.

6           THE COURT:  ALL RIGHT.  WE'LL BE IN RECESS FOR JUST A

7   FEW MINUTES WHILE I GATHER MY THOUGHTS.  YOU CAN STICK AROUND.

8   I'M JUST GOING TO SIT HERE, BUT YOU DON'T HAVE TO WATCH ME

9   UNLESS YOU WANT.  WE'LL DEFINITELY BE BACK ON THE RECORD AT

10   1:55.

11           (RECESS.)

12           THE COURT:  MR. LAZCANO IS CHARGED -- ARE YOU READY?

13   TRINA?  OKAY.  MR. LAZCANO IS CHARGED WITH VIOLATING 8 U.S.C.

14   SECTION 1325(A)(1) WHICH PROVIDES, IN RELEVANT PART, THAT ANY

13:57:41  15   ALIEN WHO ENTERS OR ATTEMPTS TO ENTER THE UNITED STATES AT ANY

16   TIME OR PLACE OTHER THAN AS DESIGNATED BY IMMIGRATION OFFICERS

17   SHALL BE GUILTY OF A MISDEMEANOR.  THE GOVERNMENT ALLEGES THAT

18   ON OCTOBER 18, 2020, A UNITED STATES CUSTOMS AND BORDER

19   PROTECTION AGENT ENCOUNTERED DEFENDANT APPROXIMATELY THREE

20   MILES EAST OF THE OTAY MESA, CALIFORNIA, PORT OF ENTRY AND ONE

21   MILE NORTH OF THE BOUNDARY BETWEEN THE UNITED STATES AND

22   MEXICO.

23           THE GOVERNMENT PRESENTED -- THE ELEMENTS OF THE

24   CHARGE FOR UNLAWFUL ATTEMPTED ENTRY INCLUDE THE DEFENDANT WAS

25   AN ALIEN AND NOT A UNITED STATES CITIZEN AT THE TIME OF

13:58:23  1    ATTEMPTED ENTRY, THE DEFENDANT HAS A SPECIFIC INTENT TO ENTER

2    THE UNITED STATES AT A TIME AND PLACE OTHER THAN AS DESIGNATED

3    BY IMMIGRATION OFFICERS, THE DEFENDANT HAD THE SPECIFIC INTENT

4    TO ENTER THE UNITED STATES FREE FROM OFFICIAL RESTRAINT AND THE

5    DEFENDANT DID SOMETHING THAT WAS A SUBSTANTIAL STEP TOWARDS

6    COMMITTING THE OFFENSE.  THE GOVERNMENT HAS THE BURDEN OF

7    PROVING EACH OF THESE ELEMENTS BEYOND A REASONABLE DOUBT.

8            THE GOVERNMENT'S FIRST WITNESS WAS BORDER PATROL

9    AGENT RYAN COURTNEY KNEE.  AGENT COURTNEY TESTIFIED THAT HE

10   ENCOUNTERED THE DEFENDANT IN AN AREA THAT WAS ONE MILE NORTH OF

11   THE UNITED STATES-MEXICO BORDER AND APPROXIMATELY THREE MILES

12   EAST OF THE OTAY MESA PORT OF ENTRY ON OCTOBER 18TH AROUND

13   3 A.M.  AGENT COURTNEY WAS RESPONDING TO A CALL FROM AN RVSS

14   OPERATOR WHO IDENTIFIED A GROUP OF PERSONS IN THAT AREA.  AGENT

13:59:16 15   COURTNEY DESCRIBED THE AREA AS ROUGH TERRAIN WITH DENSE BUSHES,

16   ROCKS AND UNSTABLE GROUND.  AFTER BEING STOPPED, DEFENDANT RAN

17   FROM AGENT COURTNEY AND FELL WHEN HE WAS RUNNING AWAY.

18   DEFENDANT WAS INJURED DURING THE FALL BUT WAS ABLE TO WALK WITH

19   AGENT COURTNEY TO MEET MEDICAL PERSONNEL.

20           WHILE WAITING FOR THE BORDER PATROL EMT, AGENT

21   COURTNEY ASKED DEFENDANT AND THE OTHER PERSONS IN THE GROUP IF

22   THEY HAD IDENTIFICATION.  DEFENDANT PROVIDED AGENT COURTNEY

23   WITH THE IDENTIFICATION DEPICTED IN EXHIBIT 2.  EXHIBIT 2 IS

24   NOT A FORM OF IDENTIFICATION ISSUED BY THE UNITED STATES.

25   AFTER AGENT COURTNEY AND ANOTHER AGENT PROVIDED MEDICAL

14:00:07   1   ASSISTANCE, AGENT COURTNEY PERFORMED A FIELD INTERVIEW IN

2   SPANISH.  DURING THAT INTERVIEW, DEFENDANT RESPONDED THAT HE

3   WAS A CITIZEN OF MEXICO AND HE WAS IN THE UNITED STATES

4   ILLEGALLY.  AGENT COURTNEY TESTIFIED THAT DEFENDANT WAS NOT

5   HANDCUFFED AT THIS TIME, BUT HE WAS ALSO NOT FREE TO LEAVE.

6          THE COURT FINDS THAT THAT FIELD INTERVIEW IS

7   CONSISTENT WITH A TERRY STOP AND THAT THE STATEMENTS DEFENDANT

8   MADE WERE ADMISSIBLE.  AGENT COURTNEY IDENTIFIED DEFENDANT AS

9   THE PERSON WHOM HE APPREHENDED IN COURT DURING TRIAL.  AGENT

10   COURTNEY TESTIFIED ON CROSS-EXAMINATION THAT HE DOES SEE TRUCKS

11   OF UNITED STATES CITIZENS IN THE DAYTIME IN THE SAME AREA WHERE

12   HE APPREHENDED DEFENDANT.  AGENT COURTNEY ALSO TESTIFIED THAT

13   HE ASKED THE GROUP OF PERSONS WHO WERE WITH DEFENDANT WHERE

14   THEY ENTERED THE UNITED STATES.  THEY TOLD HIM IN AN AREA FROM

14:01:07  15   THE SOUTH KNOWN AS WHITE CROSS.

16          THE GOVERNMENT ALSO CALLED BORDER PATROL AGENT

17   CHRISTIAN RIVAS.  AGENT RIVAS TESTIFIED THAT AFTER DEFENDANT'S

18   ARREST HE INTERVIEWED DEFENDANT AT THE BORDER PATROL STATION.

19   AGENT RIVAS TESTIFIED THAT HE ADVISED DEFENDANT OF HIS MIRANDA

20   RIGHTS AT THE OUTSET OF THE INTERVIEW AND RE-ADVISED DEFENDANT

21   OF THOSE RIGHTS AFTER DEFENDANT HAD SOME QUESTIONS.  DEFENDANT

22   OBJECTED TO THE INTRODUCTION OF HIS POST-MIRANDA STATEMENTS ON

23   THE GROUNDS THAT DEFENDANT'S QUESTIONS INDICATED THAT HE DID

24   NOT FULLY UNDERSTAND HIS RIGHTS.  THE COURT OVERRULED THIS

25   OBJECTION AND ALLOWED AGENT RIVAS TO TESTIFY REGARDING

14:01:45  1   DEFENDANT'S POST-MIRANDA STATEMENT.

2         IN HIS POST-MIRANDA INTERVIEW, DEFENDANT TOLD AGENT

3   RIVAS THAT HIS PARENTS WERE MEXICAN CITIZENS AND THAT HE

4   ENTERED THE UNITED STATES BY WALKING AROUND THE BORDER FENCE OF

5   THE UNITED STATES-MEXICO BORDER.  HE TOLD AGENT RIVAS THAT HE

6   ENTERED THE UNITED STATES WITH THE INTENT OF GOING TO THE STATE

7   OF WASHINGTON FOR WORK AND THAT HE DID NOT HAVE PERMISSION TO

8   BE IN THE UNITED STATES.

9         THE GOVERNMENT'S LAST WITNESS WAS BORDER PATROL AGENT

10   CHRISTOPHER MODROW.  I THINK I MISPRONOUNCED IT.  SORRY.  AGENT

11   MODROW.  AGENT MODROW TESTIFIED THAT HE REVIEWED THE

12   DEFENDANT'S A-FILE AND CHECKED THE CLAIMS DATABASE FOR ENTRIES

13   RELATED TO DEFENDANT'S A-FILE.  HE TESTIFIED THAT HIS SEARCH OF

14   THE CLAIMS DATABASE INDICATED THAT THERE IS NO RECORD OF THE

14:02:37  15   DEFENDANT APPLYING TO ENTER THE UNITED STATES LAWFULLY.

16         THE CORPUS DELICTI DOCTRINE REQUIRES THAT A

17   CONVICTION MUST REST ON MORE THAN A DEFENDANT'S UNCORROBORATED

18   CONFESSION, CITING TO UNITED STATES VERY NIEBLA-TORRES, 847

19   F.3D 1049, 1054, NINTH CIRCUIT 2017.  THE NINTH CIRCUIT HAS

20   ADOPTED A TWO-PART TEST FOR ANALYZING WHETHER THE GOVERNMENT

21   HAS MET ITS BURDEN UNDER THE DOCTRINE.  FIRST, THE GOVERNMENT

22   MUST INTRODUCE SUFFICIENT EVIDENCE TO ESTABLISH THAT THE

23   CRIMINAL CONDUCT AT THE CORE OF THE OFFENSE HAS OCCURRED.

24   SECOND, IT MUST INTRODUCE INDEPENDENT EVIDENCE TENDING TO

25   ESTABLISH THE TRUSTWORTHINESS OF THE ADMISSIONS UNLESS THE

14:03:25   1   CONFESSION IS, BY VIRTUE OF SPECIAL CIRCUMSTANCES, INHERENTLY

          2   RELIABLE, INHERENTLY UNRELIABLE, I THINK.  THAT, AGAIN, CITING

          3   TO NIEBLA-TORRES.  THE GOVERNMENT IS NOT REQUIRED TO PRESENT

          4   EVIDENCE THAT WOULD BE INDEPENDENTLY SUFFICIENT TO CONVICT.

          5   EVIDENCE THAT CORROBORATES THE CONFESSION IS SUFFICIENT.

          6        HERE, THE GOVERNMENT ARGUES THAT DEFENDANT'S

          7   ADMISSIONS IN HIS FIELD INTERVIEW AND IN HIS POST-MIRANDA

          8   STATEMENT ARE SUFFICIENT TO PROVE NEARLY EACH ELEMENT OF THE

          9   CHARGE.  SO THE COURT CONSIDERS WHETHER THOSE STATEMENTS ARE

         10   INDEPENDENTLY OR ADMISSIONS ARE INDEPENDENTLY CORROBORATED AS

         11   TO EACH ELEMENT.  FOR ALIENAGE, DEFENDANT ADMITTED IN HIS FIELD

         12   INTERVIEW THAT HE WAS A CITIZEN OF THE UNITED STATES AND --

         13   SORRY -- CITIZEN OF MEXICO AND NOT IN THE UNITED STATES

         14   LEGALLY.  THIS ADMISSION IS CORROBORATED BY DEFENDANT'S

14:04:19  15   POST-MIRANDA STATEMENTS WHICH ARE CONSISTENT.  IT IS ALSO

         16   CORROBORATED BY THE FACT THAT DEFENDANT PRODUCED A FORM OF

         17   IDENTIFICATION ON REQUEST THAT IS NOT ISSUED BY THE UNITED

         18   STATES, AND BY THE TESTIMONY OF AGENT MODROW THAT A SEARCH OF

         19   THE CLAIMS DATABASE YIELDED NO EVIDENCE THAT THE DEFENDANT

         20   APPLIED FOR PERMISSION TO ENTER THE UNITED STATES LAWFULLY.

         21        FOR SPECIFIC INTENT TO ENTER AT A TIME AND PLACE

         22   OTHER THAN AS DESIGNATED BY IMMIGRATION OFFICERS, DEFENDANT

         23   ADMITTED IN HIS POST-MIRANDA STATEMENTS THAT HE ENTERED THE

         24   UNITED STATES BY WALKING AROUND THE BORDER FENCE AT THE UNITED

         25   STATES-MEXICO BORDER, AND THAT ADMISSION IS CORROBORATED BY

14:04:55  1    CIRCUMSTANTIAL EVIDENCE OF HIS ARREST.  HE WAS FOUND

        2    APPROXIMATELY ONE MILE NORTH OF THE U.S.-MEXICO BORDER IN THE

        3    MIDDLE OF THE NIGHT AND APPROXIMATELY THREE MILES EAST OF THE

        4    NEAREST PORT OF ENTRY.  THE GROUP OF PERSONS WITH WHOM HE WAS

        5    FOUND ADMITTED IN THE FIELD THAT THEY HAD ENTERED BY CROSSING

        6    THE BORDER AT WHITE CROSS.

        7         FOR SPECIFIC INTENT TO ENTER AT A TIME AND PLACE

        8    OTHER THAN AS DESIGNATED BY IMMIGRATION OFFICERS, DEFENDANT

        9    ADMITTED IN HIS POST-MIRANDA STATEMENTS THAT HE ENTERED THE

       10    UNITED STATES FOR PURPOSE OF TRAVELING TO THE STATE OF

       11    WASHINGTON FOR WORK.  FURTHER EVIDENCE OF THIS ELEMENT IS PROOF

       12    BEYOND A REASONABLE DOUBT INCLUDES THAT DEFENDANT ATTEMPTED TO

       13    FLEE WHEN AGENT COURTNEY ENCOUNTERED HIM IN FULL UNIFORM AS

       14    OPPOSED TO ASKING AGENT COURTNEY FOR ASSISTANCE OR ATTEMPTING

14:05:43 15    TO SURRENDER TO UNITED STATES CUSTODY.  FOR SUBSTANTIAL STEP,

       16    THE EVIDENCE THAT DEFENDANT WAS FOUND NORTH OF THE BORDER, IN

       17    ADDITION TO HIS ADMISSIONS, PROVE THIS ELEMENT BEYOND A

       18    REASONABLE DOUBT.

       19         SO HAVING REVIEWED AND CONSIDERED THE EVIDENCE, THE

       20    COURT FINDS THAT DEFENDANT IS GUILTY OF THE CHARGE OF VIOLATING

       21    8 U.S.C. SECTION 1325(A)(1).  SO WE'LL NOW PROCEED TO

       22    SENTENCING.  DOES THE GOVERNMENT WISH TO BE HEARD ON

       23    SENTENCING?

       24         MR. BENJAMIN:  YES, YOUR HONOR.

       25         THE COURT:  PLEASE PROCEED.

14:06:10   1          MR. BENJAMIN:  YOUR HONOR, THE GOVERNMENT IS

        2   RECOMMENDING A SENTENCE OF 120 DAYS IN CUSTODY.  THIS IS

        3   PRIMARILY BASED ON THE DEFENDANT'S PRIOR AND THE SERIOUS AND

        4   AGGRAVATED NATURE OF THAT.  I DID INCLUDE IN THE EXHIBIT THAT I

        5   SENT TO THE COURT, EXHIBIT 20 FOR SENTENCING, WHICH IS -- IF

        6   THE COURT WOULD LIKE ANOTHER COPY, I HAVE ANOTHER COPY HERE AS

        7   WELL.  AND THIS IS THE ARREST REPORT THAT DESCRIBES THE FACTS

        8   OF THAT PRIOR CONVICTION SINCE OBVIOUSLY THIS IS A MISDEMEANOR

        9   CASE AND THERE'S NO PRESENTENCE REPORT TO DISCUSS THE FACTS.

       10   WHAT HAPPENED WAS THE DEFENDANT WAS BABY-SITTING A

       11   THREE-YEAR-OLD CHILD.  BASED ON THE FACTS OF THE REPORT, IT

       12   APPEARS HE ANALLY PENETRATED THE CHILD.  THE CHILD IDENTIFIED

       13   THE DEFENDANT AS BEING THE PERSON WHO HAD DONE THAT AND SAID,

       14   QUOTED DIRECTLY, THAT HIS BUTT HURT.  SO THIS IS OBVIOUSLY AN

14:07:06  15   EXTREMELY SERIOUS PRIOR CONVICTION.  THIS IS NOT THE STANDARD

       16   CIRCUMSTANCE THAT WE HAVE IN A LOT OF 1325 CASES WHERE THE

       17   DEFENDANT HAS NO CRIMINAL HISTORY OR EXTREMELY MINOR CRIMINAL

       18   HISTORY LIKE DRIVING VIOLATIONS, DRIVING ON A SUSPENDED

       19   LICENSE, THAT SORT OF THING.  THIS IS AN EXTREMELY AGGRAVATED

       20   PRIOR.

       21          ALSO, ALONG WITH THIS, THE DEFENDANT HAS BEEN ON THE

       22   RUN FROM DELAWARE PROBATION FOR OVER A DECADE AT THIS POINT.

       23   THERE'S STILL A WARRANT OUTSTANDING.  THEY DID SAY TO ME THAT

       24   THEY'RE NOT GOING TO BE ABLE TO EXTRADITE HIM NOW BECAUSE OF

       25   THE PANDEMIC.  THEY DON'T WANT AN EXTRADITION FROM CALIFORNIA

14:07:43 1   TO DELAWARE.  BUT THIS IS AN EXTREMELY SERIOUS PRIOR.  THE

2   DEFENDANT HAS BEEN A FUGITIVE FROM JUSTICE FOR WELL OVER A

3   DECADE, AND AS SUCH, A SUBSTANTIAL SENTENCE ABOVE WHAT WOULD BE

4   THE NORM FOR A DEFENDANT WITHOUT THIS SORT OF CRIMINAL HISTORY

5   IS APPROPRIATE IN THIS CASE.

6           THE COURT:  OKAY.  THANK YOU.

7           MR. STITT:  MR. STITT?

8           MR. STITT:  YES, YOUR HONOR.  WE'RE ASKING FOR A

9   TIME-SERVED SENTENCE.  MR. LAZCANO OBVIOUSLY WAS ARRESTED ON

10   THE 18TH OF OCTOBER 18TH LAST MONTH.  SO IT'S APPROXIMATELY TWO

11   WEEKS.  I'LL BEGIN BY PICKING UP WHERE MR. BENJAMIN LEFT OFF

12   WITH RESPECT TO THE 2004 DELAWARE PRIOR CONVICTION.  I THINK

13   THERE'S A FEW IMPORTANT POINTS THAT I WOULD LIKE TO MAKE ABOUT

14   THE CONVICTION.  FIRST, I THINK MR. BENJAMIN'S CHARACTERIZATION

14:08:26 15   OF IT BEING A SERIOUS CONVICTION IS ROUGHLY ACCURATE.  BUT THE

16   ARREST REPORT THAT MR. BENJAMIN SUBMITTED LED TO A CHARGE THAT

17   MR. LAZCANO DID NOT PLEAD GUILTY.  HE WAS, AFTER SPENDING ABOUT

18   SIX MONTHS IN CUSTODY, THE CHARGE WAS CHANGED.  HE WAS GIVEN A

19   TIME-SERVED RESOLUTION, AND HE WAS RELEASED FROM CUSTODY.

20           SO WHILE I HAVE NO BASIS TO DISPUTE THE AUTHENTICITY

21   OR ACCURACY OF THE PROBABLE CAUSE STATEMENT, OR ARREST REPORT

22   RATHER, THAT'S BEEN SUBMITTED, I CAN TALK GENERALLY THAT IF

23   THIS IS EXACTLY WHAT THE EVIDENCE DID BEAR OUT, ONE WOULD HOPE

24   THAT THE REDUCED CHARGE, SIX-MONTH RESOLUTION, WOULD NOT HAVE

25   BEEN THE CASE.  IN SPEAKING WITH MR. LAZCANO, HE SAID THAT

14:09:11  1   THERE'S QUITE A BIT MORE TO THE STORY AND THAT IT IS NOT

2   NECESSARILY THE ENTIRE STORY HERE.  I THINK THAT THE COURT

3   SHOULD, IN LIGHT OF THAT, GIVE IT AT LEAST SOME LESS WEIGHT.

4   THERE'S NO ALLEGATION THAT IT'S PART OF A PATTERN OF CONDUCT OR

5   MORE THAN A SINGLE INCIDENT.  IT'S 16 YEARS OLD, AND AGAIN,

6   THE SENTENCE IMPOSED WAS SIX MONTHS IN CUSTODY FOR IT.

7             WITH RESPECT TO THE PROBATION VIOLATION, I'VE

8   REVIEWED SOME OF THE LIMITED PROBATION NOTES.  THERE WERE

9   REPORTS THAT HAD BEEN SUBMITTED.  AND THE VIOLATION WAS BASED

10  ON THE PROBATION OFFICER GOING TO MR. LAZCANO'S ADDRESS AND

11  LEARNING FROM NEIGHBORS OR SOMEONE RELATED TO THIS CASE THAT HE

12  HAD SELF-DEPORTED AND GONE TO MEXICO.  SO THE VIOLATIONS OF

13  PROBATION DO NOT EXTEND IN ANY WAY FROM ALLEGATIONS OF

14  REPEATING THIS TYPE OF CONDUCT OR ANY REALLY NEW LAW

14:10:02 15  ENFORCEMENT CONDUCT.  IN FACT, THEY SHOW HE WENT TO MEXICO.  IN

16  SUPPORT OF THAT CONDITION, I HAVE SEVERAL DOCUMENTS FOR THE

17  COURT FOR SENTENCING IF I MAY.

18             THE COURT:  SURE.

19             MR. STITT:  THERE'S THREE SETS AND I PROVIDED IT TO

20  THE COURT ALREADY.  THE FIRST IS A PICTURE OF MR. LAZCANO'S

21  FAMILY.  THE SECOND SET IS A SERIES OF WORK REFERENCE LETTERS

22  SHOWING THAT HE'S BEEN EMPLOYED AS A BUS DRIVER FOR MANY YEARS,

23  AND THE THIRD IS A LETTER FROM HIS WIFE.

24             THE COURT:  GIVE ME JUST A MINUTE TO LOOK AT THESE.

25  OKAY.

14:11:14  1        MR. STITT:  YOUR HONOR, I CAN PROFFER THAT MR.

2  LAZCANO HAS WORKED AS A BUS DRIVER IN MEXICO SINCE EVEN 2005

3  WHICH DATES BACK BEFORE THESE WORK CONFIRMATIONS.  SO WHAT

4  HAPPENS WAS MR. LAZCANO LEFT THE UNITED STATES WHILE ON

5  PROBATION IN DELAWARE AND HAS LIVED AND WORKED IN MEXICO SINCE.

6  HIS FAMILY RESIDES IN HIDALGO, AND THE REASON THAT HE ENTERED

7  THE UNITED STATES IN THIS INSTANCE IS THAT HIS MOTHER, WHO IS

8  PICTURED IN THE PHOTO I PRESENTED, SHE WAS DIAGNOSED WITH

9  BREAST CANCER IN 2010 AND REQUIRES POSSIBLY A SPECIALIZED

10  TREATMENT IN MEXICO CITY, AND MR. LAZCANO HAD BEEN TAKING HER

11  TO MEXICO CITY AND ABLE TO PAY AND AFFORD THIS TREATMENT UNTIL

12  THE PANDEMIC STARTED.  SO AS A RESULT OF THE PANDEMIC, HE'S

13  BEEN FURLOUGHED INTERMITTENTLY, MOST COMMONLY ABOUT TWO WEEKS A

14  MONTH FROM HIS JOB, AND HIS INCOME HAS CORRESPONDINGLY BEEN CUT

14:12:08  15  ROUGHLY IN HALF AS A RESULT.  HE'S THE PRIMARY BREAD WINNER FOR

16  HIS FAMILY AS WELL AS THE CAREGIVER FOR HIS MOTHER.  AND THAT'S

17  WHY HE RE-ENTERED, IN ORDER TO SEEK WORK IN WASHINGTON WHICH IS

18  CONSISTENT WITH HIS STATEMENT TO AGENT RIVAS THAT WAS PRESENTED

19  AT TRIAL.

20        IN THIS CASE, WE DON'T HAVE ANY INDICATION OR ANY

21  EVIDENCE THAT MR. LAZCANO HAS TRIED TO ENTER THE UNITED STATES

22  IN THE LAST 15 YEARS, AND I THINK THAT DOES SEPARATE HIM FROM

23  MANY 1325 DEFENDANTS THAT THE COURT WOULD SEE.  WHILE THERE IS

24  THIS CONVICTION, IT IS DATED.  THE SENTENCE IMPOSED WAS SIX

25  MONTHS.  THERE'S NO INDICATION THAT IT'S A REPEATED ISSUE OR

14:12:45  1   SOMETHING THAT, YOU KNOW, I THINK WOULD DRAMATICALLY INCREASE

          2   THE SERIOUSNESS OF IT.  AND GIVEN MR. LAZCANO'S MITIGATED

          3   MOTIVATION, I THINK THAT A TIME-SERVED SENTENCE OF ROUGHLY TWO

          4   WEEKS WOULD BE APPROPRIATE.  THIS IS HIS FIRST IMMIGRATION

          5   CONVICTION.  HE'LL BE SUBJECT TO MORE SERIOUS IMMIGRATION

          6   PENALTIES AND PROSECUTIONS IN THE FUTURE SHOULD HE SEEK TO

          7   RE-ENTER BECAUSE HE WILL BE DEPORTED FOR THE FIRST TIME

          8   FOLLOWING THIS CONVICTION.

          9        SO I THINK THOSE ARE GOOD REASONS TO IMPOSE A TIME

       10   SERVED SENTENCE AT THIS JUNCTURE.  MR. LAZCANO, I THINK, HAS

       11   CERTAINLY LEARNED HIS LESSON SO TO SPEAK IN THIS CASE.  HE

       12   REALLY WAS QUITE SCARED WHEN HE GOT ARRESTED.  AGENT COURTNEY

       13   TALKED ABOUT HOW HE FELT HE WAS GOING INTO SHOCK AND HOW HE WAS

       14   GRABBING HIS LEG, AND REALLY, I THINK THIS WAS ENOUGH OF AN

14:13:36  15   ORDEAL THAT MR. LAZCANO DIDN'T FULLY CONTEMPLATE IN ITS

       16   ENTIRETY I THINK.  AND THE WAY IT'S UNFOLDED, BEING IN CUSTODY,

       17   BEING IN COVID-19 QUARANTINE AT THE MCC FOR A COUPLE WEEKS, ALL

       18   OF THESE THINGS ARE EXPERIENCES HE VERY MUCH DOES NOT WANT TO

       19   REPEAT AND I THINK ARE FURTHER REASONS TO IMPOSE A TIME-SERVED

       20   SENTENCE AT THIS JUNCTURE.

       21        THE COURT:  SO MR. LAZCANO, YOU HAVE THE OPPORTUNITY

       22   NOW TO SPEAK TO ME IF YOU WOULD LIKE BEFORE I SENTENCE YOU.

       23   YOU'RE NOT REQUIRED TO, BUT IF YOU WOULD LIKE TO, I'LL HEAR

       24   FROM YOU NOW.

       25        THE DEFENDANT:  THANK YOU, YOUR HONOR.  FIRST OF ALL,

14:14:23  1   I'D LIKE TO APOLOGIZE FOR HAVING TRIED TO COME INTO THE

2   COUNTRY.  UNFORTUNATELY, THE PANDEMIC IN MEXICO HAS AFFECTED

3   OUR ECONOMY GREATLY.  I HAD A GOOD JOB, BUT THEY CUT BACK MY

4   WORK FOR THREE CONSECUTIVE MONTHS DURING THE PANDEMIC, AND I

5   DIDN'T WORK AT ALL.  DURING THE PANDEMIC, I HAD COVID-19, MY

6   MOTHER AS WELL, AND I WAS TAKING CARE OF HER.  I WAS TAKING

7   CARE OF HER DURING THE ENTIRE QUARANTINE BECAUSE SHE WAS ILL;

8   AND WHEN I STARTED TO WORK, I WAS ONLY WORKING FOR TWO WEEKS.

9   AND LIKE MY ATTORNEY SAID, MY MOM HAD BREAST CANCER AND THEY

10   AMPUTATED; AND IN AROUND 2016, THE CANCER SPREAD TO THE BRAIN

11   AND WE WERE INCURRING A LOT OF EXPENSES TO BE ABLE TO TAKE HER

12   TO THE CANCER HOSPITAL IN MEXICO CITY.

13        DURING THE PANDEMIC, THEY SUSPENDED HER DOCTOR

14   APPOINTMENT AND THEY WERE GOING TO START THIS NOVEMBER, AND SHE

14:16:52  15   HAS TO CONTINUE GOING, AND I TRULY JUST DID NOT SEE A WAY OUT

16   TO BE ABLE TO FIND A SOLUTION WITH MY FAMILY.  THAT'S WHY I

17   TRIED AND I MADE THE DECISION TO COME OVER HERE TO WORK.  AND

18   WELL, IT REALLY WASN'T GOING TO BE FOR A LONG TIME.  MY MOM IS

19   70 YEARS OLD.  SHE EVEN TOLD ME THAT SHE MIGHT NOT HOLD ON FOR

20   MUCH LONGER, BUT IF I DIDN'T MAKE IT BACK ON TIME THAT, NOT

21   WITHSTANDING, WE WOULD SEE EACH OTHER IN HEAVEN.  THAT'S THE

22   REASON WHY I TRIED TO CROSS, AND I DO APOLOGIZE.  THANK YOU,

23   YOUR HONOR.

24        THE COURT:  OKAY.  THANK YOU, MR. LAZCANO.  FIRST OF

25   ALL, I CAN TELL YOU YOU HAVE A BEAUTIFUL FAMILY.  I APPRECIATE

14:18:56   1   SEEING THEIR PICTURE, AND I'M SORRY ABOUT WHAT YOUR MOTHER HAS

2   GONE THROUGH.  BUT THE REALITY IS YOU CANNOT COME UP HERE TO

3   WORK LEGALLY.  AND SO WHAT COULD HAPPEN TO YOU IF YOU TRY THIS

4   AGAIN IS MUCH MORE SERIOUS JAIL TIME, ESPECIALLY GIVEN YOUR

5   RECORD.  GIVEN THAT YOU HAVE NO PRIOR DEPORTATIONS, AND IT

6   APPEARS THAT YOU HAVEN'T MADE A LOT OF ATTEMPTS TO COME UP HERE

7   TO WORK, I AM GOING TO SENTENCE YOU TO TIME SERVED TODAY.  THE

8   CONCERN I HAVE, AND WHAT I WANT TO MAKE SURE YOU UNDERSTAND, IS

9   THAT WON'T BE THE SENTENCE YOU GET IF YOU COME BACK AND GET

10   CAUGHT AGAIN.  YOU'RE VERY LIKELY TO BE CHARGED WITH A FELONY

11   AND THAT COULD LEAD TO A YEAR OR MORE IN JAIL AWAY FROM YOUR

12   FAMILY.

13         I FEEL THAT A TIME-SERVED SENTENCE WILL SATISFY THE

14   FACTORS THAT I HAVE TO CONSIDER FOR SENTENCING IN 18 U.S.C.

14:20:00  15   SECTION 3553(A) INCLUDING THE NEED FOR THE SENTENCE IMPOSED TO

16   DETER YOU FROM TRYING TO CROSS OVER IN THE FUTURE.  NOW THAT

17   YOU HAVE THIS ON YOUR RECORD, IT MAKES IT MUCH MORE SERIOUS IF

18   YOU MAKE A SECOND ATTEMPT TO DO THAT.  SAYING THAT DOESN'T MEAN

19   THAT I DON'T RECOGNIZE HOW DIFFICULT IT IS RIGHT NOW

20   ECONOMICALLY IN THE PANDEMIC.  I KNOW IT'S VERY DIFFICULT.  I

21   CAN ONLY IMAGINE WHAT YOU'VE GONE THROUGH IN MEXICO.  BUT THAT

22   DOESN'T CHANGE WHAT THE CIRCUMSTANCES WILL BE IF YOU TRY TO

23   COME ACROSS AGAIN.  SO FOR THOSE REASONS, I WILL SENTENCE YOU

24   TO TIME SERVED.  I FIND THAT MR. LAZCANO CANNOT AFFORD TO PAY A

25   FINE.  DOES THE GOVERNMENT MOVE TO REMIT THE SPECIAL

14:20:39   1    ASSESSMENT?

2                     MR. BENJAMIN:  YES, YOUR HONOR.

3                     THE COURT:  MR. LAZCANO, YOU HAVE 14 DAYS TO FILE A

4    NOTICE OF APPEAL.  IS THERE ANYTHING ELSE AS TO MR. LAZCANO?

5                     MR. BENJAMIN:  NOT FROM THE GOVERNMENT, YOUR HONOR.

6                     THE COURT:  OKAY.  SO THAT'S ALL FOR THIS AFTERNOON.

7    GOOD LUCK TO YOU, SIR.  YOU CAN TAKE THESE BACK, MR. STITT.

8                     MR. STITT:  THANK YOU.

9                     (MATTER CONCLUDED.)

10                          C-E-R-T-I-F-I-C-A-T-I-O-N

11

12               I HEREBY CERTIFY THAT I AM A DULY APPOINTED, QUALIFIED
     AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED STATES
13   DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT
     TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE;
14   THAT SAID TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPTION OF MY
     STENOGRAPHIC NOTES; AND THAT THE FORMAT USED HEREIN COMPLIES
15   WITH THE RULES AND REQUIREMENTS OF THE UNITED STATES JUDICIAL
     CONFERENCE.

16                 DATED: DECEMBER 10, 2020, AT SAN DIEGO, CALIFORNIA.

17

18                          /S/ JULIET Y. EICHENLAUB
                            JULIET Y. EICHENLAUB, RPR, CSR
19                          OFFICIAL COURT REPORTER
                            CERTIFIED SHORTHAND REPORTER NO. 12084
20

21

22

23

24

25